COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION, Complainant,

v.

**Richard N. TOMPKINS Jr., Respondent.**

No. 87–989.

Supreme Court of Iowa.

Nov. 25, 1987.

Kasey W. Kincaid of Nyemaster, Goode, McLaughlin, Emery & O'Brien, P.C. and Norman G. Bastemeyer, Des Moines, for complainant.

William L. Kutmus of Kutmus & Pennington, P.C., Des Moines, for respondent.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, LAVORATO, and NEUMAN, JJ.

LAVORATO, Justice.

Richard N. Tompkins Jr. pleaded guilty to the crime of trespass in connection with an incident in which he unlawfully entered a residence searching for women's undergarments with which to sexually gratify himself. The plea led to disciplinary proceedings against Tompkins in which the Grievance Commission found that he violated Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(1) (violating disciplinary rule), (3) (engaging in illegal conduct involving moral turpitude), (6) (engaging in any other conduct adversely reflecting on fitness to practice law), and EC 1–5 (failing to refrain from all illegal and morally reprehensible conduct). Four members of the commission recommended that Tompkins' license to practice law be suspended for not less than three months while one member recommended a reprimand.

After reviewing the record de novo, see Iowa Sup.Ct.R. 118.10, we agree with the commission that Tompkins was guilty of these ethical violations. However, we are convinced the circumstances of this case warrant a suspension of not less than two years. See id. ("Upon such review de novo the court may impose a lesser or greater sanction than the discipline recommended by the grievance commission.").

Tompkins began practicing law in Mason City in 1976. At that time he also became a part-time assistant county attorney. In 1978 he was elected county attorney of Cerro Gordo County and held that position until January 1983. Thereafter he entered the private practice of law and has continued in that endeavor.

Beginning in 1977, Tompkins, by his own admission, entered a number of homes and apartments in the Mason City area without the residents' permission. He gained access in various ways. In numerous instances he entered through unlocked doors. Sometimes he used keys left with him by friends. At other times he would slip locks with a credit card or knife. The homes were usually those of people he knew.

Once inside, Tompkins would search for the undergarments of women residents so that he could use the garments for sexual gratification. Sometimes he would stay on the premises; at other times he would take the garments elsewhere.

Tompkins chronicled these unlawful entries in a sworn statement given to the Cerro Gordo County Attorney in January 1986. Under questioning by the county attorney, Tompkins admitted entering, in this manner, well over one hundred homes.

Tompkins' modus operandi included entering homes whose residents he knew would be away. On the occasion he was caught, he miscalculated. The time was November 1985. Tompkins observed a neighbor pass him on a highway. Believing no one was at her home, Tompkins drove there, found the back door unlocked, and proceeded to the basement in search of her undergarments. Once there, he was confronted by her husband. Although at first refusing to disclose why he was there, Tompkins ultimately admitted his purpose.

Seven months later, Tompkins pleaded guilty to a misdemeanor charge of criminal trespass in connection with the incident and received a suspended thirty-day jail term. Thereafter, a complaint against Tompkins, based upon these numerous illegal entries, was filed with the commission.

In the hearing before the commission, Tompkins readily admitted the ethical violations. But, in a skillfully presented case designed to meet our concerns in *Committee on Professional Ethics & Conduct v. Vesole*, 400 N.W.2d 591 (Iowa 1987) (three-

year suspension for misdemeanor convictions of indecent exposure, disorderly conduct, and public indecency), Tompkins offered convincing medical testimony regarding his present fitness to practice law. Tompkins' fitness to practice law is, of course, a prime factor in our determination of an appropriate sanction. *See id.* at 593.

At the hearing before the commission, Tompkins presented as witnesses Dr. Ronald M. Larsen, a psychiatrist, and Ms. Bobbie Hurst, a clinical psychologist, both of whom have been treating Tompkins since December 1985. Both described Tompkins' affliction and his recent efforts, by way of treatment, to control it.

Both experts diagnosed Tompkins as having a psychosexual disorder characterized as fetishism (the use of nonliving objects as a method of achieving sexual excitement) and voyeurism (repeated observation of unsuspecting people who are naked, in the act of disrobing, or engaging in sexual activity, with no sexual activity with the observed person or persons being sought). Although Tompkins' medical history reports acts of voyeurism, both experts testified that this disorder has not been part of Tompkins' behavior for thirteen years. According to Tompkins' medical history, his disorder began with a childhood incident characterized by Hurst as a sexual trauma. Neither expert felt that Tompkins was likely to be sexually assaultive or agressive to others.

After extensive psychological testing of Tompkins conducted by Hurst, Larsen recommended a two-part treatment program: intensive inpatient treatment, followed by prolonged outpatient treatment under Hurst's supervision. At Larsen's suggestion, Tompkins, in the latter part of February 1986, went through a three-week inpatient treatment program in a Minnesota hospital. There he was assigned to a specific sexual dependency unit similar to specialty units for alcoholic treatment. The inpatient treatment was directed at controlling obsessive behavior, much like a treatment program for alcoholics.

After completing his inpatient treatment, Tompkins began his outpatient treatment under Hurst's care in the latter part of March 1986. The treatment consisted of psychotherapy one hour per week. As of the time of the hearing before the commission, Tompkins was still in outpatient treatment. Throughout this treatment, Tompkins also saw Larsen, who acted as Hurst's supervisory psychiatrist.

The thrust of the inpatient and outpatient treatment was to teach Tompkins how to stop the offensive behavior. He learned and practiced techniques to reduce his sexual fixation. In addition, he was taught to identify and cope with situations (prolonged stress; prolonged moods of anger, fear, and anxiety; alcohol; drugs; interpersonal conflicts; marital conflicts) in which he would be at high risk to repeat the offensive behavior. Finally, he was trained to avoid situations that might cause him to relapse. The treatment is presumably having its desired effect because no evidence of similar offensive behavior since the incident in question was presented.

The prognosis offered by Larsen and Hurst was very optimistic, based upon Tompkins' education, intelligence level, and primarily, his response to treatment. The two experts opined that the chances were negligible (five percent) that Tompkins would repeat his behavior.

From Tompkins' testimony we learn he continually practices the thought-control techniques he learned in treatment to avoid relapses. He has also adopted preventive measures for the same reason, such as making himself accountable to someone, either his wife or his secretary, for all of his time. In addition, he has joined a support group which meets weekly. Tompkins described several stressful situations he experienced since treatment and how he was able to cope with them without falling back into his old habits. Tompkins assured the commission that treatment has worked for him and that he will continue with therapy in one form or another for the rest of his life.

Both experts felt that an additional six to nine months of intensive weekly psychotherapy was needed. Beyond that, Larsen recommended that Tompkins be monitored

for the rest of his life. By that recommendation, the doctor meant Tompkins should maintain a doctor-patient relationship throughout his life to continually reinforce the techniques he has learned to control his behavior. Underlying this recommendation is the doctor's belief that Tompkins' sexual disorder can never be cured but only controlled.

We recently recognized that "moral turpitude" is a term that has defied clear definition by the courts. *Committee on Professional Ethics & Conduct v. Patterson,* 369 N.W.2d 798, 801 (Iowa 1985). But we cited approvingly this definition:

> Perhaps the best general definition of the term "moral turpitude" is that it imports an act of baseness, vileness or depravity in the duties which one person owes to another or to society in general, which is contrary to the usual, accepted and customary rule of right and duty which a person should follow.

*Id.* (quoting *Committee on Legal Ethics v. Scherr,* 149 W.Va. 721, 726–27, 143 S.E.2d 141, 145 (1965)). The numerous acts readily admitted by Tompkins easily meet this definition. Accordingly, we, like the commission, conclude that Tompkins clearly violated DR 1–102(A)(1), (3), and (6), and EC 1–5. *See Vesole,* 400 N.W.2d at 592 (attorney's indecent exposure on three occasions violated DR 1–102(A)(3), (6), and EC 1–5; *Committee on Professional Ethics & Conduct v. Floy,* 334 N.W.2d 739, 740 (Iowa 1983) (attorney's two obscene phone calls violated DR 1–102(A)(3) and (6)).

Having concluded Tompkins acted unethically, we turn to the difficult question in this case: what sanction is justified in these circumstances.

We have said on numerous occasions that

> [a]ttorney disciplinary proceedings are not designed to punish, but rather to determine the fitness of an officer of court to continue in that capacity, to insulate the courts and the public from those persons unfit to practice law, to protect the integrity of and the public confidence in our system of justice, and

to deter other lawyers from engaging in similar acts or practices.

*Vesole,* 400 N.W.2d at 593; *Committee on Professional Ethics & Conduct v. Borchart,* 392 N.W.2d 491, 492 (Iowa 1986); *Committee on Professional Ethics & Conduct v. Rogers,* 313 N.W.2d 535, 537 (Iowa 1981). Moreover, we have recognized that a particular sanction must be tailored to the facts of each case. *Vesole,* 400 N.W.2d at 593; *Borchart,* 392 N.W.2d at 492.

Whatever sanction we deem appropriate, we must not overlook the serious nature of Tompkins' conduct, which bears directly on his fitness to practice law. It should go without saying that the more egregious and persistent the conduct, the more debased the character of the offender, and Tompkins' conduct was both egregious and persistent. By his own admission, Tompkins stealthily entered over one hundred residences, in many instances while he was serving as county attorney. He attempted to rationalize his actions by suggesting to himself, at the time, that he was not hurting anyone. What he was ignoring, however, was the possibility that serious injury or death could have resulted from the surprise and trauma of his illegal entries into people's homes. As a county attorney he should have been acutely aware that even family members have been killed or seriously injured because they were mistaken for burglars.

Further, we do not agree with Tompkins' experts that the compulsiveness of his illness should serve as a mitigating factor. *See Vesole,* 400 N.W.2d at 592 (compulsive personality disorder does not absolve attorney from responsibility for his misconduct). They admit, as does Tompkins, that he *knew* what he was doing. Thus, the experts ignore the fact that Tompkins knew he could get help for his problem but chose not to do so until faced with dire consequences.

Moreover, we agree with the committee that Tompkins' illegal conduct during his tenure as county attorney is particularly egregious. The reprehensible nature of such acts by a public servant should have been most apparent to Tompkins. One

might ask why he would knowingly break the very laws he, as county attorney, was sworn to uphold. Of course, the same question could be asked about why he, simply as a lawyer, would put himself in such a position. We might ask ourselves how the public can have confidence in our system of justice if we overlook or minimize *knowing* and *willful* criminal conduct by a person who was, at the time, not only an officer of the court but also an elected official responsible for enforcing our criminal laws.

· Finally, we must satisfy ourselves that Tompkins is a "recovered sexaholic," as his psychiatrist and psychologist suggest. We were not satisfied of this in *Vesole*. This lack of satisfaction, together with the evidence of a high rate of recidivism (at least twenty-five to fifty percent) for the particular disorder (exhibitionism), the aggressive actions of Vesole towards his victims, and Vesole's repeated conduct even after his first conviction, accounted substantially for the stringent sanction of a three-year suspension. *Id.* at 592–93. Of course, in these circumstances, protection of the public is of vital concern to us.

The conduct in this case is so egregious that we could justifiably revoke Tompkins' license or impose a stringent suspension similar to that in *Vesole*. We choose not to do so for several reasons. Our careful review of the record satisfies us that, though not cured, Tompkins has indeed recovered to the point that he probably does not pose a threat to the public. As long as he continues to practice the techniques he has learned to control his behavior, it seems unlikely that Tompkins will return to his old habits. Unlike Vesole, Tompkins, once caught, has not repeated the offensive behavior. Moreover, Tompkins has demonstrated a commitment to a lifelong term of psychiatric care to help him in his endeavor to avoid a relapse. Finally, as for deterrence, we are not convinced that revocation or a stringent sanction similar to that in *Vesole,* in these circumstances, would deter lawyers with similar disorders. More likely, such a sanction would encourage these lawyers to hide their disorders rather than admit them and seek treatment.

After carefully considering and balancing all these considerations, we are convinced that a two-year suspension, in these circumstances, is justified. Any longer period would be more punitive than protective. In addition, we believe the sanction is stringent enough to underscore the seriousness of the conduct and to reflect our continuing resolve to the public that the courts will maintain the ethics of our profession. *See Committee on Professional Ethics & Conduct v. Halleck,* 325 N.W.2d 117, 118 (Iowa 1982).

We therefore suspend Tompkins' license to practice law in the courts of this state indefinitely, with no possibility of reinstatement for two years from the date of this opinion. This suspension applies to all facets of the practice of law. *See* Iowa Sup. Ct.R. 118.12.

Upon application for reinstatement Tompkins shall establish that he has not practiced law during the suspension period and that he has in all other ways complied with the requirements of our rules pertaining to suspended attorneys. *See* Iowa Sup. Ct.R. 118.13. Any application for reinstatement shall be accompanied by satisfactory evidence that Tompkins (1) has not engaged in any similar acts of misconduct since the date of the hearing before the commission, (2) has received all outpatient treatment contemplated by his psychiatrist and psychologist, and (3) is continuing his commitment to lifetime psychiatric care. If Tompkins does apply for reinstatement, the court may appoint an independent psychologist or psychiatrist to evaluate Tompkins' condition. Costs are assessed to Tompkins pursuant to Iowa Supreme Court Rule 118.22.

· LICENSE SUSPENDED.