COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,

v.

**Alan R. HAVERCAMP, Respondent.**

No. 89–353.

Supreme Court of Iowa.

June 14, 1989.

Charles L. Harrington, Des Moines, for complainant.

Michael W. Liebbe, Davenport, for respondent.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, SCHULTZ, and LAVORATO, JJ.

PER CURIAM.

In this attorney disciplinary proceeding involving the respondent, Alan R. Havercamp, we review the Grievance Commission's findings and recommendations pursuant to Iowa Supreme Court Rule 118.10. We suspend Havercamp's license to practice law indefinitely, with no possibility of reinstatement for a period of six months from the date of this opinion.

Havercamp has been a licensed attorney since 1966. He practices in Davenport. His law practice can be described as general, touching such areas as criminal, juvenile, probate, and domestic relations law. He is also a judicial magistrate.

The Committee on Professional Ethics and Conduct filed a complaint against Havercamp. The complaint consists of four counts, alleging that Havercamp had violated various disciplinary rules and ethical considerations of the Iowa Code of Professional Responsibility for Lawyers.

The record made in the hearing before the commission included the complaint, the committee's request for admissions, testimony of witnesses, and other evidence. Havercamp did respond to the request for admissions. After finding that the allegations of the complaint were true, the commission recommended that Havercamp's license to practice law be suspended for a period of not less than six months.

Havercamp has not appealed from the commission's report to this court. *See* Iowa Sup.Ct.R. 118.11. Nevertheless, we review de novo the record made before the commission, determine the matter, and impose, as we deem appropriate, a lesser or greater sanction than the discipline recommended by the commission. Iowa Sup.Ct. R. 118.10.

We give the commission's findings and recommendations respectful consideration although they are not binding on this court. The complaint's allegations must be established by a convincing preponderance of the evidence. Matters in a request for admissions may be relied upon to meet this burden if not denied or otherwise objected to by the respondent. *Committee on Professional Ethics & Conduct v. Blomker*, 379 N.W.2d 19, 20–21 (Iowa 1985).

Like the disciplinary rules in the Code of Professional Responsibility, violations of ethical considerations are subject to disciplinary sanctions. We review the record de novo to determine whether and to what extent discipline should be imposed. Our determination in this respect is guided by certain well-recognized standards: the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the law as a whole, and the respondent's fitness to continue in the practice of law. *Id.* at 21.

Two of the four counts in the complaint deal with Havercamp's handling of a collection suit and an estate. The other two counts deal with Havercamp's alleged failure to respond to the committee's inquiries regarding complaints about his handling of the two matters. We first consider the complaints regarding the suit and the estate and then Havercamp's alleged failure to respond.

I. *The Lawsuit.*

In May 1980 Havercamp filed a $33,000 collection suit for Brunswick Corporation against David F. Smith, d/b/a 4-Seasons Sport Center. The suit was filed in Scott County District Court. In June

Smith appeared and answered through counsel.

After a continuance pursuant to Iowa Rule of Civil Procedure 215.1 in 1981, the case was dismissed in January 1983 for lack of prosecution. Havercamp took no action to reinstate the case within six months as required by the rule.

Three letters from Brunswick—one in May 1986, another in February 1987, and a third in October 1987—all refer to an alleged statement by Havercamp that the case had been refiled. Havercamp testified he was sure these letters were in response to his telephone conversations with Brunswick's in-house counsel that he *would* refile the suit. Nevertheless, Havercamp admitted that he never wrote back to correct what he characterized as Brunswick's misunderstanding of the status of the case.

Although Havercamp could have refiled the suit (the statute of limitations had not expired), he never took steps to do so. His only excuse was, "It just didn't get done."

The commission found that Havercamp's inaction demonstrated a conscious disregard of the responsibilities that he undertook in agreeing to represent Brunswick. It also found that he actively misrepresented the status of the case by allowing Brunswick to believe he had refiled the lawsuit when, in fact, he had not. We think the evidence establishes these findings by a convincing preponderance of the evidence.

We agree with the commission that these findings establish Havercamp violated Iowa Code of Professional Responsibility DR 1–102(A)(1) (violating disciplinary rule); DR 1–102(A)(4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(5) (lawyer shall not engage in conduct prejudicial to administration of justice); DR 1–102(A)(6) (lawyer shall not engage in conduct that adversely reflects on fitness to practice law); DR 6–101(A)(3) (lawyer shall not neglect legal matter); DR 7–101(A)(1) (lawyer shall not fail to seek lawful objectives of client); DR 7–101(A)(2) (lawyer shall not intentionally fail to carry out contract of employment with client); DR 7–101(A)(3) (lawyer shall not intentionally prejudice or damage client); EC 1–5 (lawyer should refrain from all illegal and morally reprehensible conduct); EC 6–1 (lawyer should act with competence and proper care in representing clients and accept only matters lawyer is competent to handle); and EC 6–4 (lawyer should prepare adequately for and give appropriate attention to legal work entrusted to lawyer).

## II. *The Estate.*

In the late 1960's Havercamp began doing legal work for Ross O. Hopkins, a chiropractor in Davenport. In 1975 Havercamp prepared a will for Hopkins in which Havercamp was named executor. There were three beneficiaries named in the will: Mrs. Ada G. Allen, a daughter; Lucille Wellington, a niece; and Mr. and Mrs. Keltner, two close friends. In the will Hopkins specifically devised his home to Wellington and another piece of realty to the Keltners. The rest of the estate was divided equally between Allen and Wellington.

In June 1981 Mrs. Keltner was appointed guardian over the person of Hopkins and conservator of his property. Havercamp filed the petition seeking her appointment. In August 1981 an inventory was filed listing the homestead with a value at $29,500 and the other piece of realty with a value of $11,000. Personal property consisting of two bank accounts totaling $40,182.85 was also listed. The following November Hopkins died. The next month Havercamp opened the estate and had himself appointed executor.

Havercamp conceded that little was done in the estate until January 1985 when an inventory was filed. Havercamp testified that he relied upon Mrs. Keltner and her husband to maintain the decedent's homestead and to provide information to the other beneficiaries, Allen and Wellington.

Mrs. Keltner died in June 1983, and thereafter her husband moved out of the state. Havercamp claimed that Keltner's death prevented him from obtaining information for a final accounting to close the conservatorship and to prepare the inheri-

tance tax report and probate inventory for the estate. Havercamp was ultimately appointed as successor conservator on December 31, 1986.

Wellington appeared and testified at the disciplinary hearing. Allen did not. According to Wellington, she met Havercamp at her uncle's funeral but he neglected to tell her that she was a beneficiary under the uncle's will.

Wellington ultimately learned she was a beneficiary in 1983. The information came to her through a Chicago attorney, Arthur G. McLendon, hired by Allen who also lived in Chicago. McLendon traveled to Davenport where he discovered that the estate had been opened and that Wellington and Allen were beneficiaries.

An affidavit, filed by Allen and apparently prepared by McLendon, complaining that the estate had been pending for an unduly long period of time triggered a court order on February 21, 1986. The order directed Havercamp to appear before the court on February 26 "for the purpose of setting a timetable and schedule for the winding up of this estate."

After the February 26 hearing, the court ordered Havercamp to (1) prepare a final report in the conservatorship within ten days, (2) file an Iowa inheritance tax return in three weeks, (3) file any federal tax returns within thirty days, (4) make a partial distribution to the residuary beneficiaries in ninety days, and (5) make every reasonable effort to file a final report and close the estate within the next six months. The order was not complied with in any respect.

In December 1986 McLendon advised the Scott County Clerk that the time limits in the February 26 order had not been met.

In October 1986 Havercamp filed an inheritance tax return for the estate. This was done under the tax amnesty program in effect during September and October 1986. The estate was ultimately rejected for amnesty. The rejection resulted in an assessment of a penalty in the amount of $1,569.52 and additional interest in the amount of $1,748.78 through July 31, 1987.

The estate was rejected for amnesty because Havercamp failed to file a personal income tax return for the decedent for 1981. The Iowa Department of Revenue had advised Havercamp that the filing of the return was a condition for amnesty. Havercamp failed to respond because, by his admission, he did not know how to prepare a final tax return for 1981. Havercamp later hired an accountant to prepare the return but by that time it was too late to take advantage of the amnesty.

In February 1987 McLendon wrote to Judge David J. Sohr who had entered the February 26 order. McLendon noted that Havercamp had not complied with the time limits set out in the order and asked that the estate be closed forthwith. The probate docket shows that Havercamp filed an interlocutory report on December 29, 1986, and again in July 1987.

On November 16, 1987, Allen again filed an affidavit in the estate listing numerous delinquencies, including Havercamp's failure to comply with Judge Sohr's February 26 order. Allen again requested that the estate be closed and distribution made. The affidavit triggered a quick response from the court. Judge Max Werling, on the same date the affidavit was filed, issued an order commanding Havercamp to appear on December 17 and show cause why he should not be removed as the fiduciary and attorney in the conservatorship and the estate.

The December 17 hearing was held before Judge Edward B. de Silva, Jr., who entered an order the following day. The court found that there were serious delinquencies in the conservatorship and the estate and ordered a further hearing regarding Havercamp's removal for January 14, 1988.

Following the January 14 hearing Judge Werling issued an order on January 22 in which he noted that Havercamp had hired an attorney. Both were ordered to appear on February 29 with proof that the estate was closed or ready to be closed. The order left no doubt that a failure to comply with it would result in removal.

On June 10, 1988, Judge Werling entered an order removing Havercamp as executor and appointing Janice Hanrahan Roemer as "administrator." Apparently the February 29 hearing was not held. The June 10 order simply notes that "the fiduciary was given to February 29, 1988, to conclude this matter and there is nothing to show in the file which in any way indicates compliance with this order."

Roemer entered the picture in May 1988. Wellington had Roemer prepare a will and then sought her assistance in connection with the delinquencies in the estate.

Roemer in turn sought the assistance of another Davenport attorney, George Goebel. After a laborious process of accounting for the assets and analyzing the damages to the beneficiaries because of Havercamp's dilatory handling of the estate, the two attorneys worked out a settlement with Havercamp. The settlement, amounting to $66,020.33, covered lost interest on the money the beneficiaries would theoretically have received had a distribution occurred within nine months following Hopkins' death as required by law. The settlement also covered the diminution in value ($31,000 to $4,000) of the homestead because of neglect as well as penalties for the late filing of the inheritance tax return.

To his credit Havercamp did not quibble about the amount of settlement and paid it from personal funds obtained through borrowings. Moreover, Havercamp received no fees from the estate. According to Roemer, Havercamp was very cooperative, freely admitted his responsibility for the loss, and accounted for "every dime."

On August 1, 1988, Judge Werling approved the settlement after hearing on notice. The order approving the settlement provided for a payment of attorney fees in the amount of $17,045.67 to Goebel, attorney for the estate.

As the commission determined, these numerous instances of neglect in the handling of the estate, freely admitted by Havercamp, easily establish by the requisite burden of proof violations of several disciplinary rules and ethical considerations. These include DR 1–102(A)(1), (5) and (6); DR 6–101(A)(3); EC 1–5; EC 6–1 and 6–4, all of which have been mentioned. The violations also include DR 6–101(A)(1) (lawyer should not handle matter lawyer is not competent to handle without seeking assistance).

■ Like the commission, we commend Havercamp for acknowledging his responsibility for damages he caused the estate and for his voluntary payment of those damages. The commission, however, properly refused to consider such payment as a mitigating circumstance. *See Committee on Professional Ethics & Conduct v. Gardalen*, 414 N.W.2d 124, 129 (Iowa 1987) (damage payment to client is not a mitigating circumstance). As the commission noted, "to allow such a payment to serve as a mitigating factor might imply to the public that an officer of the court can buy his way out of professional difficulties if financially able to do so."

III. *Failure to Respond to the Committee's Inquiries.*

■ Havercamp ignored letters from the committee asking him to respond to the separate complaints regarding his handling of the lawsuit and the estate. His excuse for not responding was simply that the allegations were true and he felt that no response was thus needed.

The commission did not accept the excuse nor do we. As the commission found, his failure to respond in each instance constituted two separate ethical violations. *Gardalen*, 414 N.W.2d at 128–29. We repeat what we have said on more than one occasion:

> Because a lawyer's cooperation with the committee's investigative requests is so important to the integrity of the investigative process as well as to the public's confidence in our profession, we recognize that any failure to cooperate with the committee should be met with severe sanctions.

*Id.* at 129.

IV. *Discipline.*

■ We agree with the commission's recommendation that Havercamp's license

to practice law in this state should be suspended indefinitely, with no possibility of reinstatement for a period of six months from the date of this opinion. The suspension shall apply to all facets of the practice of law. *See* Iowa Sup.Ct.R. 118.12. Any application for reinstatement shall be governed by Iowa Supreme Court Rule 118.13. Havercamp must include in his application an assurance that he will not handle matters that involve state court litigation or probation of estates unless he (1) associates with a lawyer experienced in those areas or (2) secures our permission upon a showing of acquired proficiency in those areas.

Costs are assessed to Havercamp pursuant to Iowa Supreme Court Rule 118.22.

LICENSE SUSPENDED.