**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**Michael K. MULFORD, Respondent.**

No. 01–0015.

Supreme Court of Iowa.

April 25, 2001.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

Michael K. Mulford, Kellogg, pro se.

TERNUS, Justice.

The Grievance Commission of the Supreme Court of Iowa reported to the court that the respondent, Michael Mulford, had violated Disciplinary Rule 1–102(A)(5) and (6) of the Iowa Code of Professional Responsibility for Lawyers based on his willful avoidance of prosecution on a federal indictment for almost ten years. The Commission recommended a public reprimand. Upon our de novo review, the court agrees that Mulford has committed an ethical violation. The court believes, however, that Mulford's misconduct, aggravated by his actions during the course of the disciplinary process and his continued refusal to acknowledge the seriousness of his actions, warrants a suspension.

I. *Background Facts and Proceedings.*

Mulford was admitted to practice law in the States of Iowa and Florida in 1980. He established a law firm in Florida shortly after passing the bar.

On April 30, 1987, a federal grand jury in the Northern District of Texas indicted Mulford and twenty-one other defendants on various conspiracy and tax-fraud charges. The indictment charged that from 1981 through 1985 Mulford and his alleged co-conspirators engaged in schemes to promote and sell false and fraudulent tax deductions to be claimed on United States income tax returns. Contemporaneously with the filing of the indictment, the United States District Court for the Northern District of Texas issued a warrant for Mulford's arrest.

Mulford was living in the Cayman Islands at the time the indictment was filed and the arrest warrant was issued. He did not return to the United States. For the next ten years, Mulford lived in various places around the world, including Panama, Europe, and Africa.

On March 19, 1997, Mulford came back to the United States and surrendered to federal authorities in Texas. He then negotiated a plea agreement with the federal prosecutor. Under the terms of this agreement, Mulford agreed to plead guilty to criminal contempt in violation of 18

U.S.C. § 401(3). The information[1] charging Mulford with this crime stated in pertinent part that

> [f]rom in or about late April-May 1987, continuing to in or about March 1997, [Mulford] did willfully, knowingly and unlawfully, disobey and resist a lawful writ, process, order, rule[,] decree and command of the United States District Court for the Northern District of Texas [in that an] [a]rrest warrant [was] issued for ... Mulford [and] [s]hortly after the warrant was issued, continuing up to the date he surrendered in Dallas, Texas, on or about March 19, 1997, Mulford remained outside the United States and willfully disobeyed and resisted the lawful process of the Court and did not surrender to the Court in *United States v. Bryan et al.*

In addition to pleading guilty to contempt, Mulford promised to "cooperate with the government by giving truthful and complete information and/or testimony concerning his knowledge of criminal activities." In exchange, the federal prosecutor agreed "not [to] bring any additional charges against Mulford for any offenses presently ... known to the government [and] agree[d] to dismiss ... the pending Indictment against [Mulford]." The written plea agreement signed by Mulford also stated that the factual resume prepared by the federal prosecutor was "true and correct."

Because the factual resume is crucial to the credibility of Mulford in the current disciplinary proceedings, we set it out in full:

> Had this case proceeded to trial, the United States would have proved the following beyond a reasonable doubt:

> 1. Defendant, Michael K. Mulford, was indicted on or about April 30, 1987, along with 21 other defendants in a 25-count Indictment by the Federal Grand Jury sitting in the Northern District of Texas, Dallas Division: U.S. v. Bryan, et al. 3:87–CR–0116–T.

> 2. Mulford was charged in Counts 1, 8, 20, 21, 22, and 23.

> 3. An arrest warrant was issued for Mulford's arrest on or about April 30, 1987.

> 4. *Shortly after the warrant was issued, Mulford became aware of the Indictment and his requirement to make himself available to the jurisdiction of the Court.*

> 5. Mulford remained outside the United States and did not surrender himself to the jurisdiction of the United States District Court for the Northern District of Texas, Dallas Division, until on or about March 19, 1997.

> 6. *Mulford thereby willfully disobeyed and resisted a lawful writ, process, order and command of the Court.*

(Emphasis added.) Mulford and his attorney signed this document on June 5, 1997, indicating that they had "[s]een [it] and [a]greed" with it.

A hearing on Mulford's plea was held on June 5, 1997, in the United States District Court for the Northern District of Texas. Mulford stated that he wished to plead guilty. At the court's request, the factual resume that Mulford had signed was read aloud. The judge then asked Mulford: "Do you agree that those are the facts of this case as they apply to you?" Mulford replied that he did. The court ruled that the factual resume provided a factual basis for Mulford's guilty plea to the charge of

---

1. By written waiver in open court, Mulford explicitly waived his right to prosecution by indictment and consented to the federal criminal contempt charge proceeding by information.

criminal contempt in violation of 18 U.S.C. § 401(3).

At sentencing, Mulford's attorney suggested that Mulford had remained out of the country because threats had been made against his life due to his alleged cooperation with the United States government and Cayman authorities in investigating the illegal drug trade. The prosecutor's attempt to introduce evidence that Mulford had not provided any substantial assistance to the drug investigation was rejected by the court on the basis that Mulford's assertions were irrelevant to the court's sentencing decision. More important to the present matter, however, is the fact that Mulford acknowledged during the course of this discussion that he was aware of the indictment from the beginning: "While it is true that I learned about the indictment, I did not return because I did [not] feel it was safe to do so."

The court sentenced Mulford to a six-month prison term on the contempt charge, and dismissed the counts against Mulford in the original indictment. Mulford served his sentence at the Fort Des Moines Residential Halfway House in Des Moines.

During the period of time involved in the indictment, Mulford practiced law and maintained an active Iowa license. He went to inactive status in Florida and Iowa when he fled to Europe. After Mulford had completed his sentence, his request to return his Iowa license to active status was granted. Mulford did not inform the Iowa licensing officials of his criminal record. Since reactivating his license Mulford has served as counsel for the Iowa legislature and has been active in the Iowa State Bar Association.

## II. *Disciplinary Proceedings.*

The Board of Professional Ethics and Conduct became aware of Mulford's criminal contempt conviction when it received a copy of the contempt citation from an anonymous source. The Board filed a complaint against Mulford in September 2000 alleging that the conduct that formed the basis for the contempt conviction was a violation of the Iowa Code of Professional Responsibility, specifically DR 1–102(A)(5) (conduct prejudicial to the administration of justice) and DR 1–102(A)(6) (conduct reflecting adversely on fitness to practice law).

At the hearing before the Grievance Commission, the Board asserted that the contempt conviction itself established Mulford's ethical misconduct under the doctrine of issue preclusion. Alternatively, the Board contended that the misconduct was established by Mulford's own admissions in the criminal contempt proceeding.

Mulford vehemently argued that his contempt conviction provided no basis for a finding of any ethical violation. Initially, he asserted that the Board had no jurisdiction because he was not acting as an attorney nor did he have an active Iowa license at the time of the alleged misconduct. He further contended that the doctrines of laches and estoppel supported dismissal of the disciplinary charges.

With respect to the contempt conviction, Mulford argued that the elements of issue preclusion were not established. He also launched a collateral attack on the contempt conviction. Mulford asserted that the contempt citation itself violated his federal constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as state constitutional guarantees. He attacked the drafting of the criminal information filed against him and asserted a lack of correct procedural notice relating to the contempt proceeding.

Mulford additionally contended that a contempt conviction pursuant to 18 U.S.C.

§ 401(3) did not constitute a crime and the Board should not be allowed to rely upon a "petty indirect contempt [citation] for failure to appear for [an] indictment, which lacked any factual or legal basis, and [which] was dismissed in all respects relating to the Respondent." He also asserted that the elements of the contempt charge were not proved because he had no notice of the underlying indictment and therefore could not have been in willful disobedience to any lawful writ, order, decree, or command.

Finally, Mulford denied that his contempt conviction established a violation of DR 1–102(A)(5) or DR 1–102(A)(6). He argued with respect to the prejudicial-to-the-administration-of-justice charge:

> It is quite obvious that the Respondent did not engage in any activity that was prejudicial to the administration of justice by voluntarily surrendering to [the] court after discovering the dismissed indictment. The Respondent had received no summons, warrant or notification that would have required his appearance.
>
> . . . .
>
> Respondent did not take any actions prejudicial to the administration of justice. If anything, the Respondent has been extremely cooperative by voluntarily surrendering and accepting the legally questionable contempt citation, for failure to appear for an indictment without any factual or legal basis, that was dismissed.

Mulford made similar arguments with respect to the fitness-to-practice-law charge. He claimed that his alleged contempt "was not conduct that adversely reflect[ed] on his fitness to practice law" and "did not relate to [his] being a lawyer nor acting as a lawyer."

As evidence of his fitness to practice law, Mulford relied on his appointment to the Iowa Supreme Court Commission on the Unauthorized Practice of Law. He also pointed out that he has had no other ethical accusations made against him and that no client suffered a legal detriment as a result of his "being cited for the petty offense of contempt of court." Additionally, Mulford argued that the purpose of the ethical canons is not "to mete out abstract justice to wayward attorneys, but [is] chiefly intended to provide protection to the public." He contended that "beyond any doubt," "the public [did] not need to be protected from [him]."

After holding a hearing at which Mulford testified, the Commission issued its report. Based on the signed factual resume, the signed plea agreement, and Mulford's testimony at the plea proceeding, the Commission found that Mulford was aware of the twenty-five-count indictment shortly after the indictment was filed and the arrest warrant issued. The Commission concluded that Mulford's guilty plea to the contempt charge established his violation of DR 1–102(A)(5) and (6), regardless of whether the contempt was criminal in nature. In recommending that Mulford be given a public reprimand, the Commission stated:

> After careful and thoughtful consideration, it is the recommendation of the Commission that Mr. Mulford receive a public reprimand for his conduct. The Commission believes that the plea of guilty to the contempt violation is a relatively minor matter but that such a plea does "adversely reflect on the fitness to practice law." The Commission also believes Mr. Mulford intentionally remained outside the United States, in part, to avoid the arrest warrant in the indictment and thus was "engaged in conduct that is prejudicial to the administration of justice." Mr. Mulford, however, has made a concerted and serious

attempt to become a very active and productive member of the Iowa Bar. Under the circumstances, therefore, we believe that a public reprimand is appropriate and should be so ordered.

The Commission filed its report with this court. The matter is now before us pursuant to Court Rule 118.10, which provides for Supreme Court review of the Commission's report.

### III. *Scope and Standard of Review.*

■■■■ This court reviews an attorney disciplinary proceeding de novo. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Stefani,* 616 N.W.2d 550, 551 (Iowa 2000); Ct. R. 118.10. Although we are not bound by the Commission's findings, we give them weight, particularly when considering the credibility of witnesses. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb,* 546 N.W.2d 215, 217 (Iowa 1996). We also respectfully consider the discipline recommended by the Commission, but we are not bound by such recommendations. *See Comm. on Prof'l Ethics & Conduct v. Humphrey,* 529 N.W.2d 255, 258 (Iowa 1995). The burden rests on the Board to prove the alleged disciplinary violations by a "convincing preponderance of the evidence." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Freeman,* 603 N.W.2d 600, 601 (Iowa 1999).

### IV. *Preliminary Issues.*

■■■ A. *Board's power.* Mulford argues that the Board had no authority to prosecute him for a violation of the disciplinary rules because he was not acting as an attorney nor was his Iowa license active during the period of time he was alleged to have disobeyed the process of the federal court. These arguments have no merit.

■■■■ This court's authority to discipline a lawyer admitted to practice in this state is not suspended merely because the attorney does not hold an active license and is not actively engaged in the practice of law. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Apland,* 599 N.W.2d 453, 454, 456 (Iowa 1999) (holding that lawyer whose license to practice was under suspension for failing to comply with continuing legal education requirements at the time of the alleged ethical violation was subject to discipline by the court); *accord Attorney Grievance Comm'n v. Shaw,* 354 Md. 636, 646, 732 A.2d 876, 881 (1999) (holding that attorney was subject to discipline even though she was on inactive status at the time of the alleged misconduct). In addition, we have held that it is not necessary to prove the "respondent was acting as a lawyer at the time of the alleged misconduct [because] lawyers do not shed their professional responsibility in their personal lives." *Comm. on Prof'l Ethics & Conduct v. Hall,* 463 N.W.2d 30, 35 (Iowa 1990). In fact, this court has imposed discipline for criminal conduct "not even remotely related to the practice of law." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lyzenga,* 619 N.W.2d 327, 332 (Iowa 2000) (disbarring attorney for multiple criminal convictions including theft, forgery and prostitution, noting that "it makes no difference that these convictions may have occurred after Lyzenga ceased practicing law and were outside the context of a professional relationship between an attorney and client"); *accord Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Palmer,* 563 N.W.2d 634, 635 (Iowa 1997) (noting power of the court to sanction attorney for criminal actions not associated with the practice of law); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Marcucci,* 543 N.W.2d 879, 882–83 (Iowa 1996) (holding that an attorney may be subject to disciplinary action for criminal conduct involving activities outside the

lawyer's professional role that did not adversely affect the lawyer's clients). Clearly, the Board had the power to bring the present charges of ethical violations against the respondent.

■ B. *Laches and estoppel.* The Board filed its complaint against Mulford slightly more than three years after Mulford was convicted of criminal contempt. Mulford claims "there has been an unduly prejudicial delay in bringing this disciplinary action." To establish the affirmative defense of laches, the respondent must prove prejudice by clear and convincing evidence. *See Comm. on Prof'l Ethics & Conduct v. Wunschel,* 461 N.W.2d 840, 846 (Iowa 1990). Mulford argues in his brief that "numerous character witnesses have died, numerous factual witnesses have died, exculpatory evidence has been destroyed and the [r]espondent's own memory has faded as he has advanced in years." He does not identify which witnesses have died, what exculpatory evidence has been destroyed, or the specific matters upon which his memory is now hazy. Additionally, we find nothing in our review of the record to support these allegations of prejudice. Accordingly, prejudice has not been proved by the requisite degree of proof. Mulford's defense of laches has no merit.

■ Mulford's estoppel claim is apparently based on the fact that his Iowa license was restored to active status. A fundamental element of an estoppel claim is a false representation or concealment of a material fact. *See Fencl v. City of Harpers Ferry,* 620 N.W.2d 808, 815 (Iowa 2000). That element is lacking here. As noted in our recitation of the facts, Mulford did not inform the licensing officials that he had been convicted of criminal contempt, nor is there any evidence in the record that these officials were aware of

this fact. Consequently, Mulford cannot claim that the reactivation of his license constituted a representation that his criminal conviction was not a barrier to licensure, or that the licensing authorities concealed the fact that his criminal conduct might subject him to disciplinary action. Therefore, the defense of estoppel also lacks merit.

## V. *Ethical Violations.*

■ A. *Factual findings.* Having concluded there is no legal impediment to the Board's prosecution of the pending disciplinary charges and that Mulford's affirmative defenses are of no consequence, we turn to an examination of the evidence to determine whether the Board proved the alleged ethical violations. The Board contends that Mulford's commission of criminal contempt constitutes a violation of the Iowa Code of Professional Responsibility in that his conduct was prejudicial to the administration of justice and reflects adversely on his fitness to practice law. *See* Iowa Code of Prof'l Responsibility for Lawyers DR 1–102(A)(5), (6). Relying on the doctrine of issue preclusion, the Board asserted that Mulford's conviction of contempt established that he committed the elements of the crime. Mulford contends that the prerequisites for application of the doctrine were not shown. We do not resolve this dispute because we think the evidence introduced by the Board independently establishes Mulford's misconduct. *See generally Hall,* 463 N.W.2d at 35 ("A criminal conviction is not a condition precedent to a disciplin[ary] proceeding when the facts themselves warrant discipline.").

Mulford was charged with violating 18 U.S.C. § 401(3) by willfully disobeying and resisting the lawful process of the United States District Court for the Northern

District of Texas.[2] We think the record in this disciplinary action proves by a convincing preponderance of the evidence that Mulford committed this crime. Mulford admitted on numerous occasions in 1997 that "[s]hortly after the warrant was issued, [he] became aware of the [i]ndictment and [the] requirement to make himself available to the jurisdiction of the [federal] [c]ourt." He also admitted on numerous occasions in 1997 that he "willfully disobeyed and resisted a lawful writ, process, order and command of the [federal] [c]ourt."

Mulford initially testified at the disciplinary hearing that he was unaware of the indictment until he spoke with his attorney in December 1996, shortly before he turned himself in to federal authorities. When pressed by further questioning, his answers were evasive and he claimed that although he "was aware [he] was a target" of a federal investigation, he "had no *confirmation* that [he] had been indicted" because he received no summons, arrest warrant or other notification. (Emphasis added.) Mulford also testified at the disciplinary hearing that his absence from the United States was for his own safety and not to avoid the process of the court.

This testimony is directly contradictory to Mulford's admissions during the federal proceedings on the contempt charge. Mulford signed a factual resume agreeing to statements in the resume that he was aware of the indictment and the requirement that he submit to the jurisdiction of the court shortly after the indictment was filed, and that he willfully disobeyed the lawful process of the court. Mulford signed a written plea agreement stating that the factual resume was "true and

correct." At the plea hearing, the factual resume was read aloud and Mulford confirmed to the court that the factual resume set forth the facts of the case. At the sentencing hearing, Mulford again acknowledged that he knew about the indictment during his absence.

Mulford attempts to explain the inconsistency between his prior admissions and his testimony at the disciplinary hearing. He argues that at the time of the contempt proceedings, he interpreted the statement in the factual resume—that he became aware of the indictment "*shortly* after the warrant was issued"—as referring to his conversation with his attorney in December of 1996. (Emphasis added.) Given the fact that the arrest warrant was issued in May of 1987, nearly ten years earlier, no reasonable person would characterize this conversation as having occurred *shortly* after the warrant was issued. Mulford's explanation for the discrepancy in his testimony is simply not believable.

In summary, we do not find Mulford's testimony before the Commission to be credible. Not only does his recent testimony conflict with his prior statements, his testimony before the Commission was consistently evasive. Mulford routinely avoided giving direct answers to the questions asked of him at the disciplinary hearing. Our conclusion with respect to Mulford's credibility is consistent with the assessment made by the Commission. The Commission implicitly found Mulford's testimony at the disciplinary hearing unbelievable when the Commission found that Mulford "was in fact aware of the [i]ndictment and [a]rrest [w]arrant and remained outside the United States in part to avoid possible

**2.** This statute provides that "[a] court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as

... [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3).

prosecution on the charges stemming from the [i]ndictment."

We find, as did the Commission, that (1) Mulford knew, during his almost ten-year absence from the United States, that he was under indictment and that a warrant had been issued for his arrest, and that (2) by his absence, he willfully avoided and resisted the lawful process of the federal court.[3] Because we find these facts to be established in the record independently of the criminal contempt citation and conviction, we need not address Mulford's claims that the contempt citation violated his constitutional rights and that the criminal information was defective.

B. *Conduct prejudicial to the administration of justice.* We now consider whether Mulford's conduct violated our Code of Professional Responsibility. Indisputably, it did.

■ It is well established that an attorney has a duty to comply with a court's orders.

We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but absent a stay, to comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect. The orderly and expeditious administration of justice by the courts requires that "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings...."
*Comm. on Prof'l Ethics & Conduct v. McCullough,* 465 N.W.2d 878, 885 (Iowa 1991) (quoting *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 590, 42 L.Ed.2d 574, 583 (1975)). Mulford apparently does not understand the scope of this duty as he justifies his ten-year absence by asserting that the indictment was "without any factual or legal basis." This allegation, even if true, had no impact on his duty to submit himself to the jurisdiction of the court.

■ This court has concluded on prior occasions that when an attorney willfully disobeys an order or command of a court or the processes of a court, the administration of justice is prejudiced. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Polson,* 569 N.W.2d 612, 614 (Iowa 1997) (holding respondent's multiple convictions of contempt for disobeying no-contact orders violated DR 1–102(A)(5) "because the respondent's contumacious conduct in defying the court's orders prejudiced the administration of justice"); *Comm. on Prof'l Ethics & Conduct v. Kaufman,* 515 N.W.2d 28, 31 (Iowa 1994) (holding attorney who had been granted immunity had ethical obligation to testify and his contemptuous refusal to do so prejudiced the administration of justice); *cf. Lyzenga,* 619 N.W.2d at 330 ("Any time a lawyer violates essential criminal laws, such conduct prejudices the administration of justice...."). It is easy to understand

---

**3.** Mulford's contention that he could not have violated the contempt statute because he was never served with any official document is unavailing. Mulford knew he had been indicted and a warrant had been issued for his arrest. His ten-year effort to avoid service of the warrant is a contempt of court. *See United States v. Allen,* 73 F.3d 64, 66 (6th Cir. 1995) (holding that the "defendant's efforts to avoid being served with the trial subpoena ... constitute[d] contempt in violation of [18] U.S.C. § 401(3) because it was a willful attempt to avoid compliance with [an] immunity order issued by [the judge]"). The fact that Mulford was successful in evading service certainly does not justify the evasion.

why an attorney's failure to comply with an order or process of the court prejudices the administration of justice. The attorney's conduct prevents the court from proceeding on the pending matter and thereby impedes the efficient operation of the courts in their effort to administer justice.

■ This case is a prime example. Mulford willfully absented himself from the country and from the jurisdiction of the federal court for nearly ten years. During this time, the court was unable to act upon the indictment filed against him. The passage of ten years certainly had an adverse effect on the ability of the government to pursue its case against Mulford and the related defendants. The effectiveness of our justice system could not have been more blatantly hampered. That Mulford's actions were prejudicial to the administration of justice is readily apparent. We hold, therefore, that he violated DR 1–102(A)(5).

■ *B. Reflection on fitness to practice law.* The Board has also alleged that Mulford's conduct reflects adversely on his fitness to practice law. Mulford argues that his conduct does not reflect adversely on his fitness to practice law in that his conduct had nothing to do with his being a lawyer or practicing law. One's fitness to practice law, however, is determined by more than one's competency in legal matters. *See Marcucci,* 543 N.W.2d at 882 ("The term 'fitness' as used in DR 1–102(A)(6) ... embraces more than legal competence."). It includes one's character and one's suitability to act as an officer of the court. *See Comm. on Prof'l Ethics & Conduct v. Hurd,* 360 N.W.2d 96, 105 (Iowa 1984) (considering evidence bearing on attorney's character in determining attorney's fitness to practice law). *See generally* Charles W. Wolfram, *Modern Legal Ethics* § 15.3.2, at 860 (1986) (noting that inquiry into bar applicant's moral charac-

ter "is to ascertain whether the applicant is suited to the practice of law").

In an analogous situation involving actions of a criminal nature, an attorney, Thompson, was convicted of two simple misdemeanors—assault and criminal trespass—stemming from an incident involving a young man who had allegedly violated a no-contact order concerning Thompson's daughter. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Thompson,* 595 N.W.2d 132, 133 (Iowa 1999). Thompson argued that his actions did not adversely reflect on his fitness to practice law, but rather should be seen as the actions of a concerned father. In rejecting this argument the court stated: "As lawyers we take an oath to uphold the law. When, as lawyers, we violate criminal statutes, we violate that oath." *Id.* at 134; *accord Polson,* 569 N.W.2d at 614 (holding contumacious conduct in defying court's orders prejudiced the administration of justice which in turn reflects adversely on attorney's fitness to practice law).

Mulford thwarted the authority of the federal court, and in doing so violated his lawyer's oath to "maintain the respect due to courts of justice and judicial officers." Iowa Code § 602.10112(1) (1999). Mulford's willful violation of his oath reflects adversely on his fitness to practice law. We agree with the Commission that Mulford violated DR 1–102(A)(6).

■ VI. *Appropriate Discipline.* Having determined that Mulford's willful disobedience of the process of the federal court violated DR 1–102(A)(5) and (6), the court must determine the appropriate sanction. We consider " 'the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the [bar] as a whole, and the respondent's fitness to continue in the practice of law.' " *Freeman,* 603 N.W.2d at

**684**

603 (quoting *Comm. on Prof'l Ethics & Conduct v. Havercamp*, 442 N.W.2d 67, 69 (Iowa 1989)). Although Mulford argues that the disciplinary process is chiefly intended to provide protection to the public, the purpose of our disciplinary system is much broader:

> Attorney disciplinary proceedings are not designed to punish, but rather to determine the fitness of an officer of [the] court to continue in that capacity, to insulate the courts and the public from those persons unfit to practice law, to protect the integrity of and the public confidence in our system of justice, and to deter other lawyers from engaging in similar acts or practices.

*Comm. on Prof'l Ethics & Conduct v. Vesole*, 400 N.W.2d 591, 593 (Iowa 1987); *accord Comm. on Prof'l Ethics & Conduct v. Tompkins*, 415 N.W.2d 620, 623 (Iowa 1987). Sanctions must be tailored to the facts of each case. *See Tompkins*, 415 N.W.2d at 623. In this process, the court considers both aggravating and mitigating circumstances. *See Freeman*, 603 N.W.2d at 603.

■■■ Turning first to the nature of Mulford's ethical violations, we consider Mulford's claim that his conduct did not constitute a *criminal* offense. We think Mulford violated a contempt statute that was clearly criminal in nature. Criminal intent is an essential element of contempt under § 401(3). *See United States v. Marx*, 553 F.2d 874, 876 (4th Cir.1977) (defining criminal intent as "a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful"). In addition, § 401 "plainly authorizes a criminal sanction." *United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1000 (8th Cir.1970) (noting that "[t]itle 18 of the United States Code, in which 401 is to be found, is exclusively concerned with defining Federal crimes

and Federal criminal procedure"). In fact, Mulford received a six-month prison sentence for violation of this statute. As the Eighth Circuit Court of Appeals noted in *Shell Oil*, "it is well established by the case law that 401 serves as the general statutory authority for punishment of *criminal* contempt." *Id.* (emphasis added); *accord United States v. Hilburn*, 625 F.2d 1177, 1179 (5th Cir.1980) (holding that § 401 contempt based on defendant's failure to respond to subpoenas was criminal because "the purpose of [the] contempt proceeding was to vindicate the authority of the court by punishing the alleged wrongdoer"). Mulford's contention that his contempt of court was not a criminal act has no merit. Mulford's related argument that criminal contempt does not really constitute a crime is equally without legal basis.

> Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both....
>
> ... [C]onvictions for criminal contempt are indistinguishable from ordinary criminal convictions, for their impact on the individual defendant is the same....
>
> ... [C]riminal contempt is a crime in every fundamental respect....

*Bloom v. Illinois*, 391 U.S. 194, 201, 88 S.Ct. 1477, 1481–82, 20 L.Ed.2d 522, 528 (1968).

■■■ We think the nature of Mulford's conduct is serious. *See United States v. Mottweiler*, 82 F.3d 769, 770 (7th Cir.1996) ("Criminal contempt of court is a dark stain on an attorney's record, even when it does not lead to imprisonment or a substantial fine."). Granted, in relation to other criminal offenses, criminal contempt may be considered a relatively minor matter. Nonetheless, Mulford's misconduct cannot be considered minor under the circumstances of this case. He purposely

impeded, for almost ten years, the administration of justice with respect to the charges pending against him. This long-term evasion of the court's lawful authority is a serious matter. *See Tompkins,* 415 N.W.2d at 623 (finding that the "serious nature" of the respondent's conduct was indicated by the fact that it was persistent).

We have considered Mulford's claim that he remained outside the United States for ten years to avoid assassination by the "Medellin Cartel" who, according to Mulford, were after him because of his participation in the federal government's investigation of narcotics smuggling. The only support in the record for this claim is the respondent's own testimony. Given our assessment of the respondent's credibility, the court seriously questions the genuineness of this explanation for his absence. Our doubt is supported by Mulford's own testimony concerning his activities while abroad. It is clear that he was not in hiding and, in fact, he argues in his brief that the United States government could have easily located him had it wanted to serve him with notice of the indictment and the arrest warrant. In any event, Mulford's alleged concerns for his personal safety are not an excuse for avoiding the jurisdiction of the federal court for ten years. *Cf. Stefani,* 616 N.W.2d at 552 (holding that fears for personal safety did not justify respondent's flight without notifying the court, his probation officer, and the Commission of his whereabouts, his reason for leaving, and his expected time of return).

Turning to the other factors relevant to deciding the appropriate discipline, we think there is also a need to deter similar conduct by lawyers in the future. We cannot overstress that lawyers, of all people, are not at liberty to ignore the processes of our legal system.

*See McCullough,* 465 N.W.2d at 886 ("a lawyer has a duty to obey a court order"). In addition, the reputation of the bar as a whole is compromised when lawyers determine for themselves which court orders or processes they see fit to obey. *See Comm. on Prof'l Ethics & Conduct v. Patterson,* 369 N.W.2d 798, 801 (Iowa 1985) ("when those licensed to operate the law's machinery knowingly violate essential criminal statutes, there inexorably follows an intensified loss of lay persons' respect for the law"). As we stated in a prior disciplinary case, "[w]e might ask ourselves how the public can have confidence in our system of justice if we overlook or minimize *knowing* and *willful* criminal conduct. . . ." *Tompkins,* 415 N.W.2d at 624.

In the past, this court has imposed sanctions ranging from a public reprimand to a two-year suspension for ethical infractions resulting from a lawyer's contemptuous acts or criminal conduct. *E.g., Stefani,* 616 N.W.2d at 552–53 (criminal conduct in possessing and/or using cocaine violated DR 1–102(A)(5) and (6), and along with respondent's failure to respond to legal notices from Board, warranted six-month suspension); *Thompson,* 595 N.W.2d at 135–36 (two misdemeanors, coupled with neglect and two previous reprimands, warranted two-month suspension); *Polson,* 569 N.W.2d at 613 (attorney conviction for domestic abuse in conjunction with his persistent conduct in defying court's no-contact orders violated DR 1–102(A)(5) and (6), and warranted suspension of license for two years); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hughes,* 557 N.W.2d 890, 895 (Iowa 1996) (where lawyer advised client to ignore court order to obtain a substance abuse evaluation, he violated DR 7–106(A) (lawyer has a duty to obey a court order and not to advise a client to ignore it), but only a public reprimand was warranted, in

part due to the attorney's unblemished record and respectful and candid manner in dealing with the court); *Marcucci,* 543 N.W.2d at 882–83 (felony conviction for OWI, third offense, which reflected adversely on the attorney's fitness to practice law, garnered six-month suspension); *McCullough,* 465 N.W.2d at 886 (where counsel egregiously and flagrantly counseled client to violate court order, in violation of DR 7–106(A), court suspended license for one year). In the present case, we think there are aggravating circumstances that warrant a sanction more severe than a public reprimand or a short suspension.

Mulford's testimony at the hearing before the Commission was evasive at best and untruthful at worst. Such deception is clearly an aggravating factor and reflects poorly on Mulford's fitness to practice law. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hoffman,* 572 N.W.2d 904, 909 (Iowa 1997) ("Respondent's ethical violation in attempting to collect an excessive fee is compounded by his attempt to mislead the grievance commission and this court with untenable excuses for seeking such a fee."); *Plumb,* 546 N.W.2d at 218 (stating that false testimony to Commission "would be a proper consideration in determining the severity of any sanction"); *Comm. on Prof'l Ethics & Conduct v. Randall,* 285 N.W.2d 161, 165 (Iowa 1979) (in determining appropriate sanction, court said: "Although Randall had a clear right to defend against the charges he did not have a right to do so in a manner that was less than forthright.").

In addition, Mulford has continued to minimize his misconduct. As noted in our review of the proceedings before the Commission, he characterizes his action in returning to the United States and pleading guilty to a "questionable contempt citation" as an indication that he was "extremely cooperative." Having avoided prosecution for ten years, Mulford was anything but cooperative. His position merely illustrates that he still does not recognize that he did anything wrong by absenting himself from the reach of the federal court for ten years. *See Hall,* 463 N.W.2d at 36 (determining lawyer's refusal to admit he did anything wrong greater than "technical violations" was an indication that the respondent did not understand his wrongdoing; court considered this attitude an aggravating factor in imposing sanction).

 Finally, the court takes as an affront Mulford's argument before the Commission and in his brief that he is fit to practice law because, as legislative counsel, he has worked on the judicial branch budget and has been instrumental in obtaining funds for the court. The respondent's argument suggests a belief that the court would be favorably influenced or intimidated by the power respondent claims to hold. The court gives no consideration to the role played by the respondent in the budgeting process. We do, however, consider Mulford's inappropriate suggestion to be an aggravating factor in determining the appropriate sanction.[4] *See* Iowa Code of

---

4. The respondent's lack of respect for the court was also evidenced at the hearing when he objected to the admission of the dismissed indictment. Mulford argued that the Board's desire to have this document made part of the record was

> [q]uite obviously ... an attempt by the petitioner [Board] to bias this particular com-

mission. The petitioner has appeared before the Iowa Supreme Court probably more than any other counsel and he does not necessarily need to rely upon such procedural nuances to bias the particular body. Mulford's suggestion of bias to support his opposition to the admission of evidence is inappropriate. *See* Iowa Code of Prof'l Responsibility EC 8–6 ("Criticisms [of judges]

Prof'l Responsibility EC 7–36 ("A lawyer should avoid undue solicitude for the comfort or convenience of judge or jury and should avoid any other conduct calculated to gain special consideration.").

We do not ignore that Mulford has had no prior disciplinary problems and has endeavored to be active in the profession since his return to active status. But these efforts cannot support a finding that he has rehabilitated himself in the face of his evasive and untruthful testimony at the disciplinary hearing, and his blatant attempts to improperly influence and intimidate this court. His conduct during these proceedings gives greater insight, we think, into respondent's fitness to practice law than does his bar involvement.

We conclude that a lengthy suspension of Mulford's license is warranted. Based on his prolonged defiance of the authority of the federal court, his lack of candor before the Commission, and his inability to appreciate the seriousness of his misconduct, we suspend the respondent's license to practice law in Iowa indefinitely with no possibility of reinstatement for one year. This suspension applies to all facets of the practice of law. *See* Ct. R. 118.12. Upon any application for reinstatement, Mulford must establish that he has not practiced law during the suspension period and that he has in all other ways complied with the requirements of Court Rule 118.18. Costs of this action shall be taxed to the respondent pursuant to Court Rule 118.22.

**LICENSE SUSPENDED.**

motivated by reasons other than a desire to improve the legal system are not justified.").