IOWA SUPREME COURT BOARD OF
PROFESSIONAL ETHICS AND
CONDUCT, Complainant,

v.

Cynthia L. TOFFLEMIRE,
Respondent.

No. 04–0803.

Supreme Court of Iowa.

Oct. 6, 2004.

Rehearing Denied Nov. 30, 2004.

Charles L. Harrington and Mark Schouten, Des Moines, for complainant.

Roger J. Kuhle, West Des Moines, and Michael S. Carroll, Des Moines for respondent.

LAVORATO, Chief Justice.

The Iowa Supreme Court Board of Professional Ethics and Conduct (Board) filed

a complaint against the respondent, Cynthia L. Tofflemire, alleging several violations of the Iowa Code of Professional Responsibility arising out of her employment with the Labor Division of Iowa Workforce Development (IWD) and her services for the State Public Defender (SPD).

Specifically, the complaint alleged that during a nine-month period Tofflemire (1) claimed sick leave from IWD on days she also certified she was engaged in indigent criminal and juvenile defense on claims she filed with the SPD, (2) filed payroll timesheets with IWD and certified indigent fee claims with the SPD claiming she regularly worked days in excess of twelve hours and as great as twenty-nine hours for both agencies combined, and (3) made false claims for payment to the SPD and false timesheets to IWD.

Finally, the complaint alleged this conduct violated Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(3) (lawyer shall not engage in illegal conduct involving moral turpitude), (4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), (5) (lawyer shall not engage in conduct prejudicial to the administration of justice), and (6) (lawyer shall not engage in any other conduct that adversely reflects on the fitness to practice law). The complaint also alleged Tofflemire charged the SPD fees that violated DR 2–106(A) (lawyer shall not charge an excessive fee).

The Board filed an amendment to the complaint, expanding on the allegation that during the nine-month period in question Tofflemire made false claims for payment to the SPD and false timesheets to IWD, including the following: (1) she claimed to be working for IWD during the same period she claimed to render services for the SPD, (2) she double-billed the SPD for the same services rendered to multiple clients, (3) she billed the SPD for time that exceeded the time actually expended for services she rendered to indigent defendants, and (4) she submitted copies of altered checks in support of claims for reimbursement for expenses she filed with the SPD. The amendment alleged this conduct also violated the above-cited disciplinary rules.

The Grievance Commission (Commission) heard testimony from eight witnesses over a three-day period and considered the affidavits of two other individuals and over three hundred exhibits. The transcript of testimony exceeds seven hundred pages. The Commission found the Board had proved several of the allegations against Tofflemire and recommended that her license should be suspended without the possibility for reinstatement for a minimum of thirty days.

We likewise find that the Board proved several of the allegations of misconduct but conclude that the egregious nature of Tofflemire's conduct warrants a longer suspension. We therefore suspend her license to practice law in this state indefinitely with no possibility of reinstatement for two years.

## I. Scope of Review.

Although Tofflemire did not appeal from the Commission's recommendation pursuant to Iowa Court Rule 35.11, she did file a statement at our request, as did the Board. Our review is de novo. *See* Iowa Ct. R. 35.10(1); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wickey*, 679 N.W.2d 1, 2 (Iowa 2004). Because we decide what discipline is appropriate in each case, we may impose a lesser or greater sanction than the one the Commission recommended. *Wickey*, 679 N.W.2d at 2.

## II. Facts.

Upon our de novo review, we find the following facts.

Tofflemire was admitted to practice law in Iowa in 1991. Following her admission to the bar, she worked for a small private law firm. When that firm closed its doors, she began her own practice. While on her own, she did some indigent criminal defense as well as family law work.

In August 1992 the Division of Labor of the Iowa Department of Employment Services hired Tofflemire as a temporary employee. Eventually, she became a full-time employee. The name of the agency was later changed from Department of Employment Services to Iowa Workforce Development. She worked out of the Des Moines office.

At the times material to these proceedings, Tofflemire was representing IWD in OSHA and child labor cases. She worked forty hours per week and was allowed to work ten hours per day, Tuesday through Friday. She also had sick leave benefits according to IWD rules and her union contract. During this same period, Tofflemire was also engaged as a contract attorney with the SPD to represent indigent clients in Polk, Dallas, and Warren counties. Tofflemire accepted cases in adult criminal and juvenile court. She also had a limited private practice consisting of family law and guardianship cases.

IWD allowed employees to work a second job in addition to their IWD responsibilities provided they notified IWD of the nature of the outside employment and that such employment would not adversely affect their IWD job responsibilities. In 1992 Tofflemire obtained consent to maintain outside employment. That consent was renewed in 1994 and was effective throughout the times material to these proceedings.

Tofflemire's performance review from IWD covering the period of July 1, 1998 through July 1, 1999 indicated that she met or exceeded expectations. During the next year, the relationship between Tofflemire and the other attorneys in her office began to deteriorate. Other attorneys in the office felt compelled to report a potential ethical violation by a former deputy labor commissioner, but Tofflemire did not join in signing the letter to the Board because she did not feel there was such a violation.

Tofflemire's performance review covering the period from August 1, 1999 to August 1, 2000 reflected a more negative tone than the year before. Comments in this review included the following: "Cindy is not always forthcoming to her supervisors," "Cindy is not a good team player," and "Cindy really needs to address her working relationship with co-workers." However, this evaluation still stated that Tofflemire's overall performance met or exceeded expectations.

In late 1999 Tofflemire began taking on more complicated cases as a SPD contract attorney. As early as March 2000, her supervisors were concerned that Tofflemire's outside work was taking time away from her full-time job with IWD.

In June, Commissioner of Labor Byron Orton learned that Tofflemire had earned nearly $50,000 for the first five months of 2000 for her SPD work. Orton became concerned that Tofflemire's outside employment had become so substantial that it was not possible for her to give the time and attention that her job with IWD demanded. When Tofflemire's supervisors suggested that she was not working full time for IWD, she assured them that she was out of the office on rare occasions, she always made sure IWD received its forty hours of work each week, and she did her

indigent defense work at nights and on weekends.

In December an Iowa Department of Revenue and Finance representative notified IWD that Tofflemire had earned $97,438 in 2000 for work she claimed to have performed for the SPD. Her name had come up during a routine cross match that the revenue department performs when state employees are receiving 1099 income from more than one state agency. This amount was in addition to the $59,391.63 annual salary Tofflemire earned as an attorney with IWD. The revenue department's disclosure caused Orton to initiate an investigation that ultimately led to the termination of Tofflemire's employment with IWD.

The investigation covered the period from January 1, 2000 through September 15, 2000. For that period, Orton reviewed the hours Tofflemire had submitted to IWD to justify her forty-hour work requirement and the amount of sick leave she had taken. Orton also gained access to billing records Tofflemire had submitted to the SPD and reviewed those records. From that review, Orton found that on twenty-six occasions Tofflemire took sick leave from IWD while claiming to do indigent defense work for the SPD. Orton also found that Tofflemire had billed substantial hours of work to the SPD on days she claimed she had also worked eight-or ten-hour days for IWD. On some days the amount of hours Tofflemire claimed from IWD employment and SPD contract work exceeded twenty-four hours for a given date. On one occasion (June 27, 2000), Tofflemire took funeral leave because of a relative's death and on that date actually performed work for the SPD.

Shortly after initiating his investigation, Orton enlisted the help of Thomas Becker, director of the SPD office. Becker conducted a spot audit of Tofflemire's claim forms. He then asked an attorney who worked for him, Michelle Swanstrom, to review all of the claim forms Tofflemire had filed for 2000. Swanstrom then prepared a spreadsheet listing the services Tofflemire claimed to have performed on a day-to-day basis for 2000. Thereafter, Orton prepared his own spreadsheet incorporating the SPD data.

On January 9, 2001, Orton met with Tofflemire to discuss his findings. His review up to that time had focused on twenty-six dates in 2000 when Tofflemire had taken sick leave from IWD but also claimed to have done work for the SPD. He presented those dates to Tofflemire at this meeting and gave her an opportunity to explain why she had billed the SPD for the same days she had claimed sick leave from IWD.

Tofflemire tried to assure Orton that her work for the SPD was not interfering with her work obligations for IWD. She again claimed that she did the bulk of her SPD work on weekends and after hours. Orton also confronted Tofflemire about the days she had billed in excess of twenty-four hours. She responded by saying that there had to be some sort of mistake in her SPD billings. When Orton asked Tofflemire about the days she claimed to have worked at the county jail or courthouse for SPD clients during work hours for IWD, she said the itemizations on her SPD claims were wrong.

Orton and Tofflemire met again on January 12 after Orton had given her a few days to come up with an explanation. On that date, Orton brought up the June 27, 2000 date when Tofflemire took funeral leave from IWD while also claiming to work 6.7 hours for SPD. Tofflemire said she had taken funeral leave and attended a funeral for a relative in Sioux Falls, South Dakota. When Orton asked her how she could have worked the 6.7 hours for SPD

on that date, she said she did the work after returning from South Dakota.

Tofflemire's explanations did not satisfy Orton so he terminated her employment with IWD that same day. His reasons for doing so included her abusing the IWD sick leave policy; deliberately falsifying timesheets, work sheets, production records, materials, or any other records related to work activities; and lying during his investigation. A short time later, Becker terminated Tofflemire's contract with the SPD because of his concerns that she had submitted inaccurate billing itemizations and fee claims to the SPD.

At the hearing before the Commission, Orton testified in more detail about his investigation. From his testimony we find that the 26 sick days that Tofflemire took represented approximately 15% of the 180 workdays for the period reviewed. In addition, Tofflemire billed the SPD for 247 of 259 calendar days during the same period. Although Tofflemire consistently told Orton that she did SPD work on weekends, his spreadsheet showed otherwise. On a number of weekends she billed no time at all to the SPD.

Becker likewise testified in more detail about his investigation. From this testimony we find that the $97,438 that Tofflemire earned in 2000 was almost as much as the senior supervisors working in Becker's office were paid (senior supervisors were paid slightly over $100,000 per year). Her claims were also at the very top tier of claims paid to attorneys who had contracts with the SPD. In addition, the record reflects that in 1999 Tofflemire earned $49,208.19 in SPD work and $55,972.39 from her full-time job with IWD.

Becker marveled that Tofflemire was able to meticulously capture her time as she did. He believed she had to be very disciplined in writing down how much time she spent doing the work. When he was told that Tofflemire had used no system to record her time for the SPD work billed in 2000, he responded that would be inconsistent with the detail he saw.

Swanstrom told Becker that Tofflemire's claims were in many instances at the outer edge of reasonableness. Nevertheless, Becker would not conclude that Tofflemire had not performed the services. Of course, that is not surprising because the record reflects that the SPD has no accurate way to determine whether the services were or were not performed. The SPD has to rely on attorneys being truthful in submitting claims.

Board investigator Elayne Sobel testified concerning her investigation. Sobel took information from Orton's spreadsheet, which included information from the SPD, and incorporated that information into a database. From the database, Sobel prepared a detailed analysis, which shows the following. During the period in question, Tofflemire claimed to have worked more than twenty-four hours on five different dates between her IWD and SPD employment. On one of those dates, Friday, February 25, 2000, Tofflemire claimed to have worked over twenty-nine hours between the two agencies. On thirty occasions, Tofflemire claimed to have worked over eighteen hours per day between the two agencies. On 174 of the 259 calendar days, Tofflemire claimed to have worked over ten hours per day between the two agencies. In addition, the analysis shows that—contrary to Tofflemire's claim—only a small portion of her work was done on weekends. Finally, consistent with Orton's testimony, Tofflemire claimed to have done SPD work for 247 days of the 259 days during the nine-month period under investigation. Ten of the twelve days that Tofflemire did not bill the SPD fell on a Saturday or Sunday.

Sobel's analysis also confirms that Tofflemire billed the SPD for work on the twenty-six days of sick leave Tofflemire took from IWD. On one of those days, Tofflemire claimed she was forced to stay at home because of an infected fingernail. On that day she attended a pretrial conference, which appeared on her weekly tickler/calendar for three weeks prior to the conference, indicating this date was a planned absence. In addition, the analysis shows that Tofflemire claimed to have written 290 letters during the period under investigation. For 282 of those letters, Tofflemire charged one-half hour, and she charged one-half hour for each of four identical short letters.

Sobel also reviewed Tofflemire's subpoenaed bank records and discovered that in eight instances duplicate check copies attached to claim forms filed with the SPD did not match actual checks written on Tofflemire's checking account. For example, in one instance the original check was written to a Dave Nixon on February 14, 1999 in the amount of $5.00. However, the duplicate check copy attached to the particular indigent claim form was to Kinko's in the amount of $65.42 and was purported to be written on September 30, 1999.

Sobel also reviewed the summaries Tofflemire submitted as exhibits to explain away apparent inaccuracies and inconsistencies within her timekeeping system during 1999 and 2000. Sobel found that over half of the summaries were inaccurate and the effect of each summary was to shift time from days with high SPD hours to days with low hours. Tofflemire prepared those summaries after she was given Orton's spreadsheet.

## III. Ethical Violations.

In her testimony, Tofflemire asserted that IWD and the SPD misconstrued her billing statements to the SPD, and there-fore their action against her was unwarranted. She related that in 1999 and 2000 she began taking on more complicated cases for the SPD. As a result she was no longer able to keep contemporaneous billing records as she performed services for the SPD. She testified that she resorted to what she described as "block and summary" billing in which she would summarize letters, documents, motions, or briefs on the date they were completed or filed, even though her work on the documents may have been completed much earlier.

In effect, what Tofflemire was doing was to review the file after the case was concluded and then reconstruct time and billing records for the case. As a result, her block and summary billings had little relation to the dates when the billed work was actually done. This, she said, accounted for the erroneous conclusion that she was working more than twenty-four hours in a day.

As to her billing practices, the Commission found:

> After reviewing the record in this matter, the Commission is very troubled by many inconsistencies and inaccuracies that are apparent in Respondent's billing and recordkeeping process. The Commission is mindful of the fact that mere negligence is generally insufficient to sustain a finding of misrepresentation or conduct that is prejudicial to the administration of justice. However, a review of the entire record in this matter leads the Commission to conclude that the Respondent conducted herself with a significant and reckless disregard for the accuracy and truthfulness of her billing and timekeeping records.

We agree with and adopt these findings.

The Commission made these findings after reviewing ninety-eight separate indigent defense claims that Tofflemire had

submitted to the SPD during 2000. As to these claims, the Commission was "quite frankly amazed" that the claims could contain as much detail and itemization as were found on the claims given that the itemizations were not prepared or reconstructed until several months after the services were performed. Like the Commission, we do not believe that it is possible to reconstruct accurate billing records when such a substantial amount of time has passed after the completion of the services.

Without contemporaneous time records to support her billings, the Commission had little faith in the accuracy of the summaries Tofflemire produced to explain inconsistencies or impossibilities such as billing for more than twenty-four hours in a day. We likewise have little faith in the accuracy of those summaries.

One glaring example of the inaccuracy concerning Tofflemire's summaries involved SPD client Anthony Lange. Tofflemire claimed that a time entry for Lange was improperly typed in with a date of February 25, 2000, rather than January 14, 2000. According to Tofflemire, the work shown for Lange actually occurred a month earlier, and the incorrect date was a typographical error. However, at the hearing, Tofflemire was shown copies of district court filings which indicated that the services she performed for Lange actually did occur on February 25, 2000. She was unable to give a satisfactory explanation why her summary entry was inaccurate. The Commission noted that it was troubled during the course of the hearing with Tofflemire's inability to provide succinct and direct answers to questions pertaining to her billing and recordkeeping practices.

Tofflemire insisted that the SPD administrative rules did not require dates to be included in a billing statement. The Commission however pointed out that Tofflemire chose to designate dates for the various services itemized on her fee claims and found that it would be "disingenuous to assume that a party reviewing the fee claims would not reasonably believe that the services rendered corresponded with the dates shown on the fee claim itemizations." Moreover, when questioned about this matter, Tofflemire was unable to give a satisfactory example of how the billings themselves indicated they were summary billings rather than contemporaneous billings.

Tofflemire's testimony that the SPD's administrative rules did not require dates to be in the billing statement is misleading. The SPD's written instructions for completing claims clearly provide that the claim form should have attached to it an "itemization detailing the dates, services provided and billable hours for each service." We find incredible her testimony that because these instructions fail to define the term "services," she did not know how to properly complete the form.

■■■ Describing Tofflemire's billing method as a "recipe for disaster," the Commission concluded that her timekeeping practices for her SPD work constituted conduct prejudicial to the administration of justice and conduct adversely reflecting on her fitness to practice law in violation of DR 1–102(A)(5) and DR 1–102(A)(6). The Commission further concluded that Tofflemire's submission of itemized billings "with such a questionable level of accuracy rises to the level of reckless disregard for the truth." The Commission therefore concluded that such conduct constituted misrepresentation in violation of DR 1–102(A)(4). We agree with and adopt all of these conclusions. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Grotewold*, 642 N.W.2d 288, 293 (Iowa 2002) (concluding attorney's

reckless disregard for the truth constituted misrepresentation).

■ As to the check alteration issue, Tofflemire testified that all the expenditures were actually made and she therefore did nothing wrong in altering the original duplicate copies and attaching them to her claim forms. The Commission disagreed, concluding that such actions constituted conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5). We likewise agree with and adopt this conclusion and the Commission's finding that such conduct is "bound to undermine public trust in the accuracy and validity of attorney expense reimbursements sought from public funds." *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes,* 588 N.W.2d 121, 123 (Iowa 1999) (noting that "there is no typical form of conduct that prejudices the administration of justice," but a "common thread" in cases dealing with this violation is that "the attorney's act hampered the efficient and proper operation of the courts or of ancillary systems upon which the courts rely").

■ Turning to the sick leave issue, the Commission found that Tofflemire was correct in contending that IWD work rules and the collective bargaining agreement do not place any particular constraints on the use of sick leave. Nevertheless, the Commission frowned upon the practice, noting that "in the eyes of the public, moonlighting on a second job is not generally viewed as an acceptable practice during the time a person claims sick leave from their primary employer."

We take issue with the Commission's finding that the IWD work rules and the collective bargaining agreement do not place constraints on the use of sick leave. To the contrary, the collective bargaining agreement and the IWD work rules allow an employee to use accrued sick leave when personal illnesses or injuries would require the employee's confinement, or render the employee unable to perform assigned duties, or when performance of assigned duties would jeopardize the employee's health or recovery. The IWD work rules and collective bargaining agreement are clear that sick leave should not be used for any other reason. The IWD work rules provide that abuse of sick leave means an employee is claiming sick leave for purposes other than those provided for in the collective bargaining agreement. Clearly, working for the SPD while claiming sick leave from IWD constitutes an abuse of sick leave. Not only is this an abuse of sick leave, but it also constitutes a misuse of public funds.

The Commission was particularly concerned, as we are, about two incidents involving sick leave. One occurred on April 19, 2000 when Tofflemire claimed nine hours of sick leave because of an infected fingernail and billed six hours to the SPD. On that date Tofflemire attended a pretrial conference that had been on her calendar for three weeks, indicating that the date was a planned absence rather than a legitimate claim for sick leave. The other incident concerned the June 27, 2000 sick leave claim for a relative's funeral. On that date, Tofflemire appeared in court on a plea and sentencing for one SPD client and on an arraignment for another. The arraignment had been on her calendar for some time before June 27. The Commission had difficulty believing that the timing of these leaves and the timing of the court appearances were merely coincidental. We think they were not coincidental, but planned.

The June 27 funeral incident is troubling for another reason. Tofflemire originally told Orton that she did indeed go to the funeral in Sioux Falls, South Dakota. In an answer to a Board interrogatory, she

admitted that she had not gone to the funeral.

The Commission concluded that Tofflemire's "cavalier attitude towards taking IWD sick leave while still performing SPD work constitutes conduct that is prejudicial to the administration of justice" in violation of DR 1–102(A)(5). We think so too. In addition, we think her actions were egregious enough to constitute illegal conduct involving moral turpitude in violation of DR 1–102(A)(3). *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hansel*, 558 N.W.2d 186, 189 (Iowa 1997) (stating " '[m]oral turpitude' in the context of attorney misconduct means illegal conduct done with a fraudulent or dishonest intent"); *Comm. on Prof'l Ethics & Conduct v. Hall*, 463 N.W.2d 30, 35 (Iowa 1990) (noting that for purposes of disciplinary proceedings in which moral turpitude is an issue, it is "immaterial that respondent was not charged or convicted of a crime").

Concerning the Board's charge of "over-billing," the Commission had concerns that Tofflemire had repeatedly over-billed the SPD. However, because of the haphazard way that she kept time records, the Commission felt there was no way to prove this. However, the Commission did find that Tofflemire had overcharged for six letters. Four of those letters were brief identical letters to witnesses concerning their review and signing of proposed affidavits. Tofflemire billed .5 hours for each of the six letters. Because the Commission simply did not believe that Tofflemire expended three full hours preparing the letters, it concluded that the billing constituted conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5) and collection of an excessive fee in violation of DR 2–106(A). Although we agree with and adopt these findings and conclusions, we go one step further. We think there is ample evidence from this record to reasonably infer that Tofflemire repeatedly over-billed the SPD.

## IV. Discipline.

We have consistently said that the appropriate discipline in a particular case turns on the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and the respondent's fitness to continue in the practice of law. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lyzenga*, 619 N.W.2d 327, 329–30 (Iowa 2000). We also consider aggravating and mitigating circumstances when determining the appropriate sanction. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Freeman*, 603 N.W.2d 600, 603 (Iowa 1999).

Tofflemire offered mitigating evidence in the form of character testimony from judges, attorneys, and her daughter. These witnesses stated that Tofflemire is trustworthy, truthful, thorough, willing to take difficult cases and clients, works hard, and zealously advocates for her clients. But as the Commission pointed out, "the common denominator among all of [these witnesses] is the fact that none of them were intimately familiar with [Tofflemire's] billing or timekeeping practices." With the exception of one witness, none of these witnesses was "familiar with her former duties and job performance with [IWD]."

Tofflemire has no history of disciplinary action. We consider that in her favor.

However, giving evasive or untruthful testimony at a Commission hearing is an aggravating circumstance. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb*, 546 N.W.2d 215, 218 (Iowa 1996). As mentioned, Tofflemire claimed she used block and summary billing. However, the billing claims she submitted to the SPD do not reflect that system. The

claims make it appear that the detailed billings were contemporaneously made. Moreover, she was evasive and unresponsive in many of her answers, and her explanatory summaries were substantially inaccurate. Finally, although she used the language "block and summary" billing to describe her billing and recordkeeping system, we consider that system bogus.

▇▇▇ A mitigating factor is the attorney's recognition of some wrongdoing. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lane*, 642 N.W.2d 296, 302 (Iowa 2002). Conversely, the attorney's failure to appreciate the wrongfulness of his or her actions is an aggravating circumstance. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bell*, 650 N.W.2d 648, 655 (Iowa 2002).

▇▇▇ In her statement to this court, Tofflemire admits that she was sloppy in keeping time records, she should not have attempted to work privately when she was sick, and she mistakenly submitted several copies of carbon checks as proof of expenses that at times were the improper check carbon. At first blush, these statements appear to demonstrate an appreciation of wrongdoing, weighing in favor of mitigating the sanction. However, on closer examination, each of the statements is followed by an excuse, evidencing a lack of an actual appreciation of her wrongful conduct.

Moreover, during the hearing before the Commission, Tofflemire consistently maintained that she did nothing wrong and that any misrepresentations she made were the results of honest mistakes. For example, she claimed she used a calendar for 1999 when she was preparing her 2000 claim forms and incorrectly typed the wrong dates on the itemization. She also claimed she made errors in transcribing numbers from her handwritten notes, but she never produced the notes. Sometimes she claimed she simply mistyped the itemization—striking an adjacent key rather than the correct key when preparing her claim form. And although conceding her summary billing was misleading, she stated she was never asked about it, but would have explained if only she were asked. Concerning her actions in doing SPD work while claiming sick leave from IWD, she stated she was forced to do the work to avoid committing an ethical violation. She chose to ignore, however, that she could have done the work on her own time and avoid claiming pay for sick leave.

To justify her action in doing SPD work while claiming sick leave from IWD, Tofflemire stated the IWD work rules did not properly define "abuse of sick leave" to guide her in deciding when sick leave was justified. To the contrary, we have already indicated the rules were very specific as to what constituted an abuse of sick leave.

Finally, she maintained that but for her refusal to sign the ethics complaint against the former deputy commissioner, her current ethical problems would never have happened, implying her fellow workers at IWD were conspiring against her.

Simply put, Tofflemire has steadfastly refused to take blame for her actions. Instead, she has sought to shift the blame from herself to other persons or things. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Fleming*, 602 N.W.2d 340, 342 (Iowa 1999) (an attorney's "attempt to shift the blame elsewhere ... reflects poorly on [the lawyer's] fitness to practice law").

▇▇▇ No standard discipline is imposed for particular instances of attorney misconduct. *Grotewold*, 642 N.W.2d at 294. However, attorneys who have engaged in misrepresentation and deceit have received lengthy suspensions because such conduct

"constitutes a grave and serious breach of professional ethics." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Stein,* 603 N.W.2d 574, 576 (Iowa 1999). As we have said on several occasions:

> Fundamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the public we serve are damaged when our officers play fast and loose with the truth. The damage occurs without regard to whether misleading conduct is motivated by the client's interest or the lawyer's own.

*Comm. on Prof'l Ethics & Conduct v. Bauerle,* 460 N.W.2d 452, 453 (Iowa 1990).

What is troubling here is that instead of an isolated instance of misrepresentation, there was repeated deception. Each time Tofflemire prepared a claim form it appeared the services were performed contemporaneously when in fact they were not. Not once but eight times she attached false carbon copies of checks to her claim forms. Each time she claimed sick leave she was representing to her employer, IWD, that she was sick when in fact she was well enough to perform SPD work. The deception continued right into the hearing with her explanatory summaries.

In other instances of similar misconduct, lawyers have been suspended from three months to three years. *See, e.g., Lane,* 642 N.W.2d at 302 (lawyer suspended for six months for submitting an application to the court for attorney fees in the amount of $16,000 for a brief that was largely copied from an uncredited source; lawyer had a prior reprimand); *Stein,* 603 N.W.2d at 575–76 (lawyer suspended for two years for persistent course of deceit and misrepresentation in a case in which lawyer misrepresented that he had done work to clear title by performing a contract of forfeiture; lawyer previously had been reprimanded and his license had been suspended); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Romeo,* 554 N.W.2d 552, 553–54 (Iowa 1996) (lawyer suspended for three years for falsifying written records to protect client; lawyer previously had been publicly reprimanded); *Comm. on Prof'l Ethics & Conduct v. Ramey,* 512 N.W.2d 569, 571–72 (Iowa 1994) ("[l]awyers cannot be excused for false statements on the basis of a sloppy, or even casual, unawareness of the truth"; lawyer suspended for three months for one false statement to a judge and his failure to disclose exculpatory evidence; lawyer had been suspended before for an income tax violation and false certification); *Comm. on Prof'l Ethics & Conduct v. Zimmerman,* 465 N.W.2d 288, 293 (Iowa 1991) (lawyer suspended for six months for filing a false fee application with the court that misrepresented the amount of work he and his wife, the conservator, had done in a conservatorship and for charging an excessive fee; lawyer had been involved in a prior disciplinary case); *Comm. on Prof'l Ethics & Conduct v. Cody,* 412 N.W.2d 637, 640–41 (Iowa 1987) (lawyer's license suspended for two and one-half years for executing two insufficient fund checks when the behavior was not an isolated incident).

Finally, we ordered six-month suspensions in several cases involving excessive fees. *See, e.g., Lane,* 642 N.W.2d at 302; *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hoffman,* 572 N.W.2d 904, 909–10 (Iowa 1997).

Given the conduct here, we think a suspension lengthier than the one the Commission recommended is warranted. Accordingly, we think a two-year suspension is appropriate.

## V. Disposition.

We suspend Cynthia L. Tofflemire's license to practice law in this state indefinitely with no possibility of reinstatement for two years. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 35.12(3).

Upon any application for reinstatement, Tofflemire must establish that she has not practiced law during the suspension period and has in all other ways complied with the requirements of Iowa Court Rules 35.13 (procedure on application for reinstatement) and 35.21 (notification of clients and counsel). If Tofflemire intends to engage in the private practice of law upon any future reinstatement, she shall submit satisfactory evidence that she will have in place, use, and maintain billing practices that will ensure contemporaneous billing.

Costs of this action are taxed to Tofflemire pursuant to Iowa Court Rule 35.25.

**LICENSE SUSPENDED.**