# IN THE SUPREME COURT OF IOWA

No. 18–0535

Filed September 21, 2018

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**DENNIS R. MATHAHS,**

Respondent.

On review of the report of the Iowa Supreme Court Grievance Commission.

The grievance commission recommends we suspend an attorney's license to practice law in this state based on the attorney's charging and collecting of excessive fees and his failure to supervise his nonlawyer employee. **LICENSE SUSPENDED.**

Tara van Brederode and Wendell J. Harms, for complainant.

Leon F. Spies of Spies, Pavelich & Foley, Iowa City, for respondent.

**WIGGINS, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board brought a complaint against an attorney, alleging numerous violations of the Iowa Rules of Professional Conduct while the attorney performed legal services for the Iowa State Public Defender (SPD). A panel of the Iowa Supreme Court Grievance Commission found that the attorney's conduct violated our rules.

Based on the attorney's violation of our rules, the commission recommended we suspend his license to practice law in this state for forty-five days. On our de novo review, we find the attorney violated the provisions of our rules. We disagree, however, with the length of the recommended suspension. We suspend the attorney's license to practice law in Iowa for sixty days from the date of the filing of this opinion.

## I. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Laing*, 832 N.W.2d 366, 367 (Iowa 2013). The Board must prove ethical violations by a convincing preponderance of the evidence. *Id.* at 368. A convincing preponderance of the evidence lies between the typical preponderance standard in a civil case and proof beyond a reasonable doubt in a criminal case. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. West*, 901 N.W.2d 519, 522 (Iowa 2017). We may impose a greater or lesser sanction than what the commission has recommended upon proof of an ethical violation. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Vandel*, 889 N.W.2d 659, 662 (Iowa 2017). The commission's findings and recommendations do not bind us, although we respectfully consider them. *Id.*

## II. Background Facts and Proceedings.

On June 23, 2017, the Board filed a complaint against Dennis Mathahs alleging a number of violations of the Iowa Rules of Professional Conduct. On August 28, the Board filed a recasted complaint alleging the same rule violations. On September 13, Mathahs filed a motion to dismiss, claiming the doctrine of laches. Specifically, Mathahs argued the Board delayed for more than four years in bringing its complaint after he had self-reported his misconduct in April 2013 and such delay unduly prejudiced his ability to defend himself. The Board resisted Mathahs's motion to dismiss, arguing the delay was reasonable. The commission overruled Mathahs's motion to dismiss. The Board then filed an amended recasted complaint alleging the same rule violations that the Board had alleged in its original complaint.

On December 29, the Board and Mathahs entered into a joint stipulation pursuant to Iowa Court Rule 36.16. In the stipulation, the parties agreed to the relevant facts and the rule violations. The parties also agreed to waive a formal hearing. On January 5, 2018, the commission approved and accepted the stipulation with the condition of commencing a hearing as scheduled on January 10, for the purpose of admitting evidence regarding the appropriate sanction for the agreed upon violations of rule 32:1.5(a) and 32:5.3(b).

Stipulations of facts bind the parties. Iowa Ct. R. 36.16(2); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 532 (Iowa 2013). We construe such stipulations "with reference to their subject matter and in light of the surrounding circumstances and the whole record, including the state of the pleadings and issues involved." *Nelson*, 838 N.W.2d at 532 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Knopf*, 793 N.W.2d 525, 528 (Iowa 2011)). With stipulations conceding

rule violations, however, "we will only enforce the stipulation[s] if there is sufficient legal consideration." *Id.* Based on the stipulations of the parties and our de novo review of the record, we make the following findings of fact.

Mathahs has practiced law in Iowa since 2001. Upon obtaining his law license, Mathahs has practiced mostly from an office in Marengo. Although he practiced with a firm for a brief period after becoming an attorney, Mathahs has been in a solo practice for most of his career.

In October 2001, the SPD and Mathahs entered into a contract whereby Mathahs would provide legal services to indigent adults and juveniles in certain Iowa counties. The contract initially specified that Mathahs would provide services in seven counties. Through a series of renewals, the geographic scope increased to as many as nineteen counties. Mathahs testified his SPD work eventually constituted more than ninety-nine percent of his practice. The parties agree Mathahs was very busy and performed his representation of indigents and juveniles satisfactorily. Mathahs continued in this line of work until the expiration of his most recent contract with the SPD on May 1, 2013. Since that time, Mathahs has not been under contract with the SPD.

To receive payment from the SPD for his services, Mathahs was required to submit General Accounting Expenditure (GAX) forms to the SPD detailing the dates, specific services performed, and the amount of time for each service. Mathahs was also required to submit itemization of expenses, including mileage. The GAX form requires the submitter to certify the following:

> I, the undersigned attorney, certify that I have completed my services under the appointment; that I have not received nor have I entered into any agreement to receive compensation for these services, direct or indirect, from any

> source other than the State Public Defender; and that the above information summarizes the services and expenses for which I am entitled to payment. I further state that an itemized statement of services and expenses is attached hereto and a copy has been provided to my client.

At least two SPD employees review each GAX form before approving it.

On March 1, 2013, Samuel Langholz from the SPD wrote to Mathahs about his concerns over the accuracy of the hours and mileage expenses recorded on Mathahs's GAX forms. Langholz wrote that Mathahs had claimed more than 3000 hours and had received more than $180,000 in fiscal year 2010 (July 1, 2009, to June 30, 2010).

Langholz and Mathahs met on March 7 to discuss the matter. On March 24, Mathahs wrote to Langholz to explain the inaccuracies and discrepancies in his GAX forms. After acknowledging he had signed the GAX forms and accepting responsibility for the incorrect information, Mathahs explained how the errors had occurred.

With regard to the excessive hours, Mathahs explained it was the result of inattentiveness on the part of his legal secretary. Mathahs attributed his secretary's inattentiveness to the brutal murder of her ex-husband. He stated he could not fire her because her ex-husband's death had ended child support and left her with no income.

Mathahs further explained he had instructed his secretary as to her duties by dictation on cassette tapes and had told her to work from the dictation sequentially. Each tape contained information regarding not only billings but also all correspondence, motions, reports to the court, and other matters. She would listen to the tapes and transcribe the correspondence, motions, and reports but would put the billing off until later. She would then go back and listen to the same tapes, fast-forwarding through the correspondence, motions, and reports she had already completed to get to the parts about billing. Because she skipped

around when transcribing the dictation, she would bunch together time from many different dates into one date instead of recording the time as hours spent over the course of many days. According to Mathahs, after becoming aware of her mistakes, he told her to stop skipping around, but she failed to comply. The secretary also haphazardly entered the dates of service, and thus the dates of service on the GAX forms often did not correspond to the dates Mathahs had done the actual work.

With regard to the excessive mileage expenses, Mathahs explained that beginning in 2009, he made single trips for several clients and erroneously billed each client for the total mileage.

On April 23, Langholz rejected Mathahs's explanation of his fee reimbursement claims based on the number of hours Mathahs had allegedly worked and Mathahs's explanation of his mileage reimbursement claims. On April 26, Mathahs self-reported his misconduct in a letter to the Board. The Board received the letter on April 29.

On September 23, 2015, after investigating the overpayments by the SPD to Mathahs, the attorney general's office informed the SPD that the Iowa Department of Justice and Division of Criminal Investigation found no provable evidence of intent to steal or defraud, and Mathahs's explanations were contrite and did not contradict any documentary evidence.

Based on Mathahs's misconduct, the Board filed a complaint, alleging a number of violations of the Iowa Rules of Professional Conduct. Relevant to this appeal are rules 32:1.5(a) (unreasonable fees or expenses) and 32:5.3(b) (lack of supervision over a nonlawyer employed by a lawyer). On January 5, 2018, the commission approved and accepted the stipulation with the condition of commencing a hearing as

scheduled. The commission held the hearing on January 10. On March 27, the commission entered its findings of fact, conclusions of law, and recommendations. The commission found Mathahs violated rules 32:1.5(a) and 32:5.3(b).

Mathahs did not appeal but submitted a statement regarding sanctions, asserting that a suspension greater than fifteen days was unwarranted. *See* Iowa Ct. R. 36.21. We discuss additional facts as necessary.

### III. Laches.

Laches constitutes "an 'equitable doctrine premised on unreasonable delay in asserting a right, which causes disadvantage or prejudice to another.' " *See Comm. on Prof'l Ethics & Conduct v. Wunschel*, 461 N.W.2d 840, 846 (Iowa 1990) (quoting *First Fed. Sav. & Loan Ass'n v. Blass*, 316 N.W.2d 411, 414 (Iowa 1982)). "Prejudice 'cannot be inferred merely from the passage of time.' " *Id.* (quoting *Cullinan v. Cullinan*, 226 N.W.2d 33, 36 (Iowa 1975)). The party so contending carries the burden of proving prejudice by clear and convincing evidence. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672, 680 (Iowa 2001).

We have stated, "Some, but not all, jurisdictions that have considered the question [of laches] allow a lawyer to assert such a defense in a disciplinary proceeding." *See Wunschel*, 461 N.W.2d at 846. Iowa is one of the jurisdictions that so allow. *See id.* (applying the rules applicable to the laches defense to the facts of the case and finding the attorney could not prevail on this theory because his presented evidence failed to establish the requisite prejudice).

Our review of the parties' stipulation reveals no evidence to support allegations of prejudice. *See Iowa Supreme Ct. Att'y Disciplinary*

*Bd. v. Wintroub*, 745 N.W.2d 469, 476 (Iowa 2008) (finding the attorney made only generalized arguments that he had been prejudiced); *Mulford*, 625 N.W.2d at 680 (finding the attorney failed to prove prejudice by clear and convincing evidence).

Additionally, Iowa Court Rule 36.21 provides,

> If no appeal is taken . . . the supreme court will set a date for submission of the grievance commission report. The supreme court will notify the parties that they may file written statements with the supreme court in support of or in opposition to the discipline the grievance commission recommends. . . . Upon submission, the supreme court will proceed to review de novo the record made before the grievance commission and determine the matter without oral argument or further notice to the parties.

Iowa Ct. R. 36.21. According to this rule, we only review the commission report and the record made before the commission. *Id.* There is nothing in the report regarding laches. Furthermore, Mathahs did not appeal under rule 36.22 the laches ruling overturning his motion to dismiss. Accordingly, we will not consider the laches issue any further.

**IV. Ethical Violations.**

**A. Prohibition Against Unreasonable Fees—Rule 32:1.5(a).** This rule provides, "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses, or violate any restrictions imposed by law." Iowa R. Prof'l Conduct 32:1.5(a). The rule lists specific factors in determining whether a fee is unreasonable; however, the factors "are not exclusive[,]" and the fees charged must be "reasonable under the circumstances." *Id.* cmt. 1.

The Board used three frames of reference to show that Mathahs improperly billed the SPD. First, from November 18, 2008, to March 2, 2011, Mathahs double-billed 25.4 hours for his representation of five clients. These hours do not include travel. At a contract rate of $60 per

hour, these hours amount to an overpayment of $1524. Second, from July 1, 2009, through June 30, 2011, Mathahs claimed duplicate mileages totaling 20,206 miles, which at thirty-five cents per mile would amount to $7072.10. Third, during fiscal year 2010, Mathahs claimed $186,219 in fees (3103.65 hours multiplied by $60) and $15,788.85 for mileage expenses (45,111 miles multiplied by thirty-five cents). The Board argued billing more than 3000 hours in a twelve-month period was not believable.

The stipulation shows Mathahs agreed that he double-billed the five clients. Furthermore, Mathahs's mileage expense claims from July 1, 2009, through June 30, 2011, far exceed what Mathahs could reasonably claim. In his April 23, 2013 letter, Langholz wrote,

> You regularly billed multiple clients for the full mileage to the same location on the same day. And on some of these days[,] you also billed mileage to multiple other locations as well, often billing for the full trip to each location even when you took only a single trip. On two days[,] you billed more than [1000] miles . . . . On twenty-six days, you claimed mileage expenses for three or more trips to the same county courthouse in the same day. And on four occasions, you billed the same client twice for the same trip to the same courthouse in different cases.

Mathahs had a reasonable claim to receive compensation for the expenses incurred to make a work-related trip; however, he did not have a reasonable claim to receive compensation multiple times for the expenses incurred for the same trip.

Additionally, we agree with the commission that although the Board presented no evidence by which the commission could determine the validity of the hours claimed, the total number of hours that Mathahs claimed to have worked on SPD work alone during FY 2010 is unusually high. At the commission hearing, Mathahs explained the inordinate number of hours for which he was paid resulted from receiving

compensation for time that he had logged in previous years when the cases lasted more than one year but had not been billed until the case was finished.

For the very reason that attorneys could bill longer cases upon completion, Langholz also looked at the claims data. Specifically, in his April 23 letter, Langholz detailed the number of hours Mathahs had billed on certain days. On at least sixty-nine days, Mathahs had billed more than sixteen hours in the day. These days included six days in which Mathahs had billed more than twenty-four hours and twenty days in which he had billed twenty hours or more. Langholz wrote, "Your time records do not reflect that the surrounding days were unusually low as would be expected if these high billing days were merely the result of data entry errors." Langholz further wrote, "And the aggregate billing of [3000] hours in one calendar year further casts doubt on [your] explanation [of careless data entry by the secretary]." Based on his investigation, Langholz concluded it was not appropriate to renew Mathahs's contract with the SPD. We think the time records in tandem with the excessive hours claimed in FY 2010 show that Mathahs unreasonably billed the SPD.

Finally, Mathahs conceded he billed the SPD for excessive hours and mileage and reimbursed the state for some of the excessive fees and mileage expenses he billed. Based on the record, we conclude the Board proved by a convincing preponderance of the evidence that Mathahs violated rule 32:1.5(a).

**B. Responsibilities Regarding Nonlawyer Assistance—Rule 32:5.3(b).** This rule provides,

> With respect to a nonlawyer employed or retained by or associated with a lawyer:

. . . .

     (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer[.]

*Id.* r. 32:5.3(b). Rule 32:1.0 defines "reasonable" or "reasonably" as "the conduct of a reasonably prudent and competent lawyer." *Id.* r. 32:1.0(h).

Comment 2 to rule 32:5.3 states in part,

     [2] Lawyers generally employ assistants in their practice . . . . Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer must give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client, and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline.

*Id.* r. 32:5.3 cmt. 2. When a nonlawyer makes a mistake that is not a direct consequence of the attorney's inattentive supervision, the attorney does not violate rule 32:5.3. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dunahoo*, 799 N.W.2d 524, 534 (Iowa 2011).

In *Iowa Supreme Court Attorney Disciplinary Board v. Barnhill*, 847 N.W.2d 466 (Iowa 2014), we suspended an attorney's license for sixty days for violating rule 32:5.3, among other ethics rules. *Id.* at 481–82, 488. We reasoned the attorney knew the office manager had previously embezzled from the law firm, yet the attorney allowed the office manager to handle the client's trust account without reasonable supervision. *Id.* at 481. In fact, the attorney authorized and directed the office manager to pay the client's bills and sign the attorney's name on trust account checks. *Id.* The office manager completed these actions without supervision from the attorney. *Id.*

Like the attorney in *Barnhill*, Mathahs failed to make reasonable efforts to ensure his secretary's conduct conformed to the professional obligations of a lawyer. He had no other billing system and relied on his secretary to properly interpret and transcribe his dictation. Mathahs knew of her diminished mental state and lack of attentiveness at work because of her ex-husband's murder. Yet upon finding billing errors, he simply instructed her to listen to the dictations sequentially and continued to allow her to prepare his GAX forms. A reasonably prudent lawyer in Mathahs's shoes would have taken more care to ascertain that his secretary did not repeat her mistakes, especially when she began working remotely and Mathahs found it difficult to monitor her compliance with office procedures. Mathahs ultimately failed to ensure the accuracy of the GAX forms his secretary completed. We conclude the Board proved by a convincing preponderance of the evidence that Mathahs violated rule 32:5.3(b).

**V. Sanction.**

In imposing the appropriate sanction, we consider "the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and [the attorney's] fitness to continue in the practice of law." *Laing*, 832 N.W.2d at 367–68 (alteration in original) (quoting *Comm. on Prof'l Ethics & Conduct v. Kaufman*, 515 N.W.2d 28, 30 (Iowa 1994)). We also consider mitigating and aggravating factors. *Id.* at 374. "[W]e look to prior similar cases while remaining cognizant of their limited usefulness due to the variations in their facts." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 62 (Iowa 2009). We ultimately determine an appropriate sanction based on the particular facts of each case because there is no standard sanction for a particular type of misconduct. *Iowa*

*Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 588 (Iowa 2011).

We take Mathahs's violations seriously. His lack of adequate supervision over his secretary resulted in the submission of erroneous GAX forms. We sanctioned an attorney for sixty days when the attorney failed to reasonably supervise her employee in violation of rule 32:5.3(b) among other ethical violations. *Barnhill*, 847 N.W.2d at 481–82, 488.

Sanctions for charging and collecting unreasonable fees generally range from sixty days to two years. *See Laing*, 832 N.W.2d at 373, 375 (suspending the attorneys' licenses for eighteen months for charging and submitting claims for excessive fees in managing their client's assets, drafting annual conservator's reports, and preparing tax returns); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carty*, 738 N.W.2d 622, 624–25 (Iowa 2007) (imposing sixty-day license suspension for accepting the full probate fee before filing the final report, collecting an illegal and excessive fee by failing to amend his ordinary fee claim when the gross value of the estate was reduced, and collecting duplicate fees for extraordinary services that included ordinary services for which he had been compensated); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lane*, 642 N.W.2d 296, 297–98, 300–02 (Iowa 2002) (imposing six-month license suspension when attorney requested excessive attorney fees for allegedly spending eighty hours to write a brief that he had plagiarized); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hoffman*, 572 N.W.2d 904, 909–10 (Iowa 1997) (imposing six-month suspension when attorney tried to mislead the commission and the supreme court with untenable excuses for requesting over $37,000 in attorney fees after spending only twenty hours on a claim); *Comm. on Prof'l Ethics & Conduct v. Zimmerman,* 465 N.W.2d 288, 291–93 (Iowa 1991) (suspending an

attorney's license for six months for submitting an application requesting legal fees that duplicated nonlegal administrative fees and requesting fees for 89.75 hours of legal service when in actuality the attorney had spent only 19.5 hours on preparing legal matters while his legal assistant spent 39.85 hours on bookkeeping and report preparation); *Comm. on Prof'l Ethics & Conduct v. Coddington,* 360 N.W.2d 823, 824–26 (Iowa 1985) (suspending a license for two years when the attorney paid himself a total of $33,600 from conservatorship funds before district court approval of the fees and the court only approved $18,600 of those fees).

We recognized the responsibility of lawyers to avoid billing errors in connection with SPD contract work in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Tofflemire,* 689 N.W.2d 83 (Iowa 2004). In *Tofflemire,* an attorney worked fulltime for the Iowa Workforce Development (IWD) and engaged as a contract attorney with the SPD. *Id.* at 86. Upon learning that the attorney earned $97,438 in 2000 for SPD work, the commissioner of labor initiated an investigation covering the period from January 1, 2000, through September 15, 2000. *Id.* at 87. The commissioner found on twenty-six occasions the attorney took sick leave from the IWD while claiming to perform SPD work, billed substantial hours of work to the SPD on days she allegedly worked eight- or ten-hour days for the IWD, and on some days billed in excess of twenty-four hours for a given date. *Id.* The commissioner terminated the attorney for abusing the IWD sick-leave policy, deliberately falsifying timesheets, and lying when confronted about the discrepancies. *Id.* at 88.

At the commission hearing, the attorney testified she used block-and-summary billing. *Id.* at 89. In other words, she would reconstruct time and billing records for a given case after she completed the work.

*Id.* We agreed with the commission that it was impossible to reconstruct accurate billing records when a substantial amount of time had passed since the attorney's completion of the work. *Id.* at 90. We gave little faith to her block-and-summary billing explanation because the claims she had submitted to the SPD did not reflect that system. *Id.* at 92–93. Rather, the submitted claims made it appear that she had contemporaneously made the detailed billings. *Id.*

Moreover, the commission showed particular concern regarding two incidents involving sick leave. *Id.* at 91. In the first incident, the attorney claimed nine hours of sick leave with IWD because of an infected fingernail and billed six hours of work to the SPD. *Id.* In the second incident, the attorney claimed sick leave allegedly to attend a relative's funeral. *Id.* In both incidents, the attorney made court appearances on behalf of her SPD clients. *Id.* The commission found and we agreed that the timing of the court appearances and the timing of the sick leaves reflected planning rather than mere coincidence because the dates of the court appearances had been on the attorney's calendar before she claimed sick leave. *Id.*

The attorney in *Tofflemire* not only billed excessive fees but also altered checks and abused her employer's sick-leave policy. *Id.* at 91–92. Additionally, she gave evasive and untruthful testimony at the commission hearing. *Id.* at 92. We found her block-and-summary billing explanation "bogus." *Id.* at 93. The attorney also failed to appreciate the wrongfulness of her actions and in fact maintained she did nothing wrong. *Id.* She attempted to shift blame from herself to other persons, maintaining that her refusal to sign the ethics complaint against the former deputy commissioner elicited her coworkers at the IWD to conspire against her. *Id.*

Furthermore, we took particular issue with the attorney's "repeated deception." *Id.* at 94. Specifically, the attorney made the claim forms appear as if she had prepared them contemporaneously, attached false carbon copies of checks to her claim forms on eight occasions, and claimed sick leave when in fact she was well enough to perform SPD work. *Id.* She continued her deception into the hearing. *Id.* After considering the aggravating and mitigating factors, we suspended the attorney's license for two years. *Id.* at 95.

The case before us is distinguishable from *Tofflemire*. Unlike the attorney in *Tofflemire* who showed no actual appreciation for her wrongdoing and blamed her coworkers as having a vendetta against her, Mathahs recognizes the full extent of his inaccurate billing practices and takes responsibility for his misconduct. Additionally, in concluding that a two-year suspension was appropriate in *Tofflemire*, we highlighted the attorney's "repeated deception." *Id.* at 94. Notably, in contrast to the attorney in *Tofflemire* who gave evasive and untruthful answers, Mathahs cooperated with the Board's investigation and was truthful in his answers. Accordingly, imposing a two-year suspension would be clearly excessive in light of the facts of this case.

*Carty* provides some guidance on the length of the suspension we ought to impose in this case. We recognize *Carty* is a probate case; however, it involves illegal and excessive fees. 738 N.W.2d at 628. In *Carty*, we suspended an attorney's license for sixty days and ordered him to repay to the trust the $6165 that he had improperly received. *Id.* at 625. We observed the attorney had a prior public reprimand and never took any remedial action to return the excessive ordinary fees and the duplicate extraordinary fees he had charged and collected. *Id.* at 622–23, 625. We noted the violations resulted in part from miscommunication

between the attorney and his new secretary but concluded this circumstance did not excuse him from his ethical violations. *Id.* at 624.

Deception would undoubtedly compound the nature and extent of the alleged ethical violations. *See Hoffman,* 572 N.W.2d at 909 ("[The attorney's] ethical violation in attempting to collect an excessive fee is compounded by his attempt to mislead the grievance commission and this court with untenable excuses for seeking such a fee."); *see also Lane,* 642 N.W.2d at 302 (stating "[h]onesty is fundamental to the functioning of the legal profession" and finding the attorney intended to deceive when he requested excessive attorney fees for a plagiarized brief); *Zimmerman,* 465 N.W.2d at 292–93 (stating the attorney knowingly misled the court in order to obtain excessive fees and incorporating this fact as an aggravating factor).

Unlike in *Tofflemire* and as in *Carty,* misrepresentation and deception are absent from this case. The attorney general's (AG) office closed the criminal investigation of Mathahs without filing any charges. The AG could not find proof beyond a reasonable doubt that Mathahs intended to steal from or defraud the SPD. First, the AG found that Mathahs's billable hours on an annual average basis were high but believable. Moreover, it could not locate any billings for events or work that did not actually occur. Second, the AG stated the circumstances showed an alternative explanation to intentional theft: Mathahs's secretary was responsible for billing based on Mathahs's dictation. The AG noted the secretary's personal life and professional attention had plummeted during her employment under Mathahs since the murder of her ex-husband. Third, there appeared to be some relationship between the murder and the beginning of the duplicate mileage billings. Fourth, the former secretary had told the new secretary to bill mileage for each

client while Mathahs instructed the new secretary to only bill for each trip. Fifth, when Mathahs hired the new secretary, excessive mileage billing declined. The AG therefore found the new secretary's story about correcting the billing practice more credible. Thus, the AG concluded the billing errors appeared much more like accidental and less like intentional theft.

Moreover, the parties stipulated that Mathahs did not violate rules 32:8.4(b) and 32:8.4(c) and provided no facts to support a violation of these rules. Iowa R. Prof'l Conduct 32:8.4(b) (prohibiting a lawyer from "commit[ting] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects"); *id.* r. 32:8.4(c) (prohibiting a lawyer from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation").

Based on the caselaw and the facts of this case, we think a sanction of sixty days or less may be appropriate. Before deciding on the exact sanction, we now turn to the mitigating and aggravating factors present in this case.

**A. Mitigating Factors.** Mathahs fully cooperated with investigations by the Board, the SPD, and the Iowa state auditor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Qualley*, 828 N.W.2d 282, 294 (Iowa 2013) (stating cooperation mitigates the sanction). For example, upon Langholz's request, Mathahs withdrew from his cases.

The cooperation, however, followed the commencement of the SPD's investigation, which made the filing of the Board's complaint inevitable. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barry*, 908 N.W.2d 217, 231 (Iowa 2018) (stating the attorney's "remorse and cooperation came on the coattails of the clerk of court's discovery of his [wrongdoing]" and "[t]he chronology tends to deflate consideration of

remorse and cooperation as mitigating factors." (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 467 (Iowa 2014) (second quote))). Mathahs self-reported after Langholz expressed his suspicions over the billing practices and rejected Mathahs's explanations. Although we could give deflated credit to Mathahs's self-reporting and cooperation, because of his sincere acceptance of responsibility, we opt to give him full credit. *Compare id.* (finding the attorney's ambivalent letter reflected "an oxymoronic, but all too familiar, combination of self-serving justifications and sincere explanations for his actions" and giving deflated credit to the attorney for his cooperation), *with Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kingery*, 871 N.W.2d 109, 122 (Iowa 2015) (considering the attorney's "*sincere* acceptance of responsibility as a mitigating factor" (emphasis added)).

Mathahs also acknowledged his personal and professional responsibility for the billing errors. *See Nelson*, 838 N.W.2d at 542 ("An attorney's acknowledgment of ethical violations is a mitigating factor."); *Tofflemire*, 689 N.W.2d at 93 ("A mitigating factor is the attorney's recognition of some wrongdoing."); *cf. Lane*, 642 N.W.2d at 302 (finding the attorney recognized some wrongdoing yet failed to comprehend the full extent of his wrongdoing where he intended to deceive by requesting excessive and unreasonable attorney fees for a plagiarized brief).

In his March 24 letter to Langholz, Mathahs stated, "I acknowledge that erroneous claims were filed by my law office. I further acknowledge that I signed the claims and that I am responsible for any wrong information contained in the claims." Specifically, with regard to the erroneous dates of service and times, Mathahs stated, "[I]t has always been my responsibility to ensure the accuracy, prior to the submission of all fee claims." With regard to the erroneous recording of mileage

expenses, Mathahs stated, "The problem with the mileage was also my mistake." Mathahs's April 26 letter self-reporting his misconduct to the Board repeats the aforementioned statements.

In his personal statement attached to the stipulation, Mathahs stated, "I acknowledge that I made errors in inadequately supervising my secretary and signing inaccurate claims." He expressed sincere remorse, stating, "I am deeply sorry for failing to adhere to my ethical obligations, and I have learned profound life lessons as a result."

Additionally, the parties stipulated that the allegations in the complaint do not accurately reflect the high quality of legal services Mathahs provided to his indigent clients. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Box*, 715 N.W.2d 758, 766 (Iowa 2006) (stating the attorney had a reputation as a competent attorney). Moreover, the allegations are inconsistent with Mathahs's normal pattern of care and concern for the legal profession. *See id.* (stating the attorney's ethical misconduct was an isolated incident).

In addition, Mathahs has engaged in community service and pro bono work for Iowa Legal Aid and the Meskwaki Tribal Court. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hamer*, 915 N.W.2d 302, 326 (Iowa 2018) (considering the attorney's record of community service as a mitigating factor); *Barnhill*, 847 N.W.2d at 486 (same). After the termination of his contract with the SPD, Mathahs continued to represent some of his clients on a pro bono basis.

Lastly, Mathahs took corrective action to address the billing irregularities by making voluntary restitution for excessive hours and mileage expenses and offering to reimburse additional funds to the SPD. *See Barnhill*, 847 N.W.2d at 486 (stating "corrective measures to address previous misconduct are a mitigating factor" and finding the attorney's

institution of practices to help manage her trust account was a mitigating factor). The record shows that on March 15, 2013, Mathahs reimbursed the SPD $8664.60 for excessive mileage expenses. The record further shows that on May 29, Mathahs reimbursed the SPD $210.56 for excessive hours. The record also shows that on September 15, 2014, Mathahs made an additional payment of $3299.10 to the Iowa Department of Revenue to reimburse the SPD for duplicate hours and mileage expenses. Based on the record before us, Mathahs repaid the SPD a total of $12,174.26 for excessive hours and mileage expenses.

**B. Aggravating Factors.** We now turn to the aggravating factors. In September 2005, Mathahs received a public reprimand for possessing a small amount of marijuana. Prior disciplinary action affects the sanction we ought to impose in a subsequent case involving the same lawyer. *See Hoffman*, 572 N.W.2d at 909. We give little weight, however, to Mathahs's prior disciplinary action because it is unrelated to the current misconduct and some time has passed since its imposition. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stoller*, 879 N.W.2d 199, 221 (Iowa 2016).

We also consider the nature and extent of the amount of funds that Mathahs improperly collected from the SPD. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Kallsen*, 670 N.W.2d 161, 164 (Iowa 2003) (stating the nature and extent of the ethical infractions is a factor in imposing a suitable sanction). The amount of overcompensation Mathahs received from the SPD is not a small amount.

Additionally, Mathahs's pattern of misconduct occurred from 2009 to 2011. *See Hamer*, 915 N.W.2d at 326 (finding the attorney's numerous violations over a period of years reflected a pattern of

misconduct); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gallner*, 621 N.W.2d 183, 187 (Iowa 2001) ("Normally, a pattern of misconduct gives rise to enhanced sanctions."). Notably, during this period of submitting erroneous claims, Mathahs knew of his secretary's method of creating the billings, yet he failed to take reasonable remedial action other than simply instruct her to follow his dictations sequentially and nothing more.

Lastly, the SPD and the Board spent numerous hours attempting to analyze and account for the discrepancies in Mathahs's GAX forms. *See Barry*, 908 N.W.2d at 234 (stating the attorney's actions caused the client and the staff of the clerk's office to expend time and resources to investigate the attorney's misconduct and considering this an aggravating factor in imposing an appropriate sanction). Even after such expenditure of time by the SPD and the Board, the commission was unable to determine from the evidence presented whether Mathahs had repaid the SPD in full or even overpaid. The commission found fault with both Mathahs and the SPD for the lack of supporting information and the lack of adequate tracking of hours and mileage expenses. In his July 24, 2013 letter to the state auditor, Mathahs stated he missed the same information the SPD missed for the very reason that neither he nor the SPD had a claims review software.[1] The SPD's limited accounting system, however, does not excuse Mathahs from his ethical duties.

**C. Appropriate Sanction.** After reviewing the record and considering the mitigating and aggravating factors affecting our

---

[1]Our review of the July 24, 2013 letter shows that Mathahs pointed out the SPD's limited accounting system to show that his failure to detect the errors on his GAX forms did not mean he intended to defraud the SPD of its funds. Mathahs was not trying to shift the blame to the SPD, and we decline to interpret the contents of his letter as a situation of the pot calling the kettle black in order to shift blame.

determination of the appropriate sanction, we suspend Mathahs's license for sixty days.

## VI. Disposition.

We suspend Mathahs's license to practice law in Iowa for sixty days from the date of filing this opinion. Reinstatement of Mathahs's license to practice law is automatic on the day after the sixty-day suspension period expires, unless the Board objects to his automatic reinstatement. Iowa Ct. R. 34.23(2). The suspension applies to all facets of the practice of law. *Id.* r. 34.23(3). Mathahs shall comply with the notification requirements of Iowa Court Rule 34.24. We tax the costs of this action to Mathahs in accordance with Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**

All justices concur except Hecht and Christensen, JJ., who take no part.